Karra J. Porter, #5223
    Karra.Porter@chrisjen.com
Anna Christiansen, #17518
    Anna.Christiansen@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323-5000
Facsimile:  (801) 355-3472
*Attorneys for Plaintiff Joseph M. Hoskins*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JOSEPH M. HOSKINS, an individual, and all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>JARED WITHERS, in his individual capacity; and JESS L. ANDERSON, Utah Department of Public Safety Commissioner, in his official capacity<br><br>　　　　　Defendants. | **MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br><br>Civil No. 2:20-cv-00749-HCN<br><br>District Judge Howard C. Nielson, Jr.<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiff Joseph Hoskins and the Plaintiff class hereby submit the following memorandum in opposition to Defendants' Motion to Dismiss.[1]

---

[1] Defendant's Motion to Dismiss incorporates by reference arguments from an earlier filed motion to dismiss.  Plaintiff has endeavored to respond to the arguments raised in both motions.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF RELEVANT FACTS .............................................................. 1

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ................................ 11

LEGAL STANDARD ......................................................................................... 13

ARGUMENTS .................................................................................................... 13

   I.    UNDER THE ALLEGATIONS OF THE COMPLAINT, A JURY ISSUE EXISTS AS
      TO THE VIOLATION OF JOE'S FOURTH AMENDMENT RIGHTS ................ 13

     A.   The Unconstitutional Traffic Stop Violated Joe's Fourth Amendment Rights ........... 14

        1.    The Traffic Stop was Unlawful Because It Was Not Justified at its Inception ...... 14

        2.    Withers' Interpretation was not a Reasonable Mistake of Law ............................ 17

        3.    Reasonable Suspicion is Defeated Because Withers Treated Joe Differently than
           Other Drivers in Enforcing Utah Code § 41-1a-404(3) .................................... 20

     B.   Withers' Actions were not Reasonably Related in Scope to the Investigation of an
        Equipment Violation ........................................................................................ 21

        1.    The Dog Sniff was a Violation of Joe's Fourth Amendment Rights Because
           Withers Exceeded a Reasonable Duration for the Stop. .................................... 21

        2.    The Stop Became Unreasonable Because Joe did not Feel Free to Leave ............ 25

     C.   Withers' Search of Joe's Vehicle was Not Supported by Probable Cause .................. 25

     D.   Withers Lacked Probable Cause to Arrest Joe ............................................................ 26

     E.   Withers Violated Joe's Clearly Established Constitutional Rights.............................. 28

   II.   Withers is Not Entitled to Qualified Immunity for His Retaliatory Violation of Joe's First
      Amendment Rights ................................................................................................. 32

     A.   Withers' Use of His Firearm was Excessive Force ...................................................... 34

     B.   Withers Did Not have Probable Cause to Arrest of Joe.............................................. 36

   III.   Plaintiff Has Plausibly Pled A Claim for Relief under Utah Law ................................. 37

   IV.   Plaintiff Has Plausibly Pled a Violation of His Due Process Rights .......................... 38

     A.   Plaintiff Has a Constitutionally Protected Privacy Interest in His DNA .................... 39

     B.   Utah's DNA Statute Creates a Due Process Interest in the Process to Ensure the
        Destruction of DNA ........................................................................................ 40

CONCLUSION.................................................................................................... 41

# INTRODUCTION

On November 13, 2018, Plaintiff Joseph Hoskins ("Joe") was peaceably driving through Utah on I-80 when Defendant Jared Withers stopped him on a "hunch" that Joe might be trafficking drugs. Since Joe was compliant with all traffic laws, Withers stopped Joe on the pretense of a license plate display violation that, even if it had existed, is almost never enforced. The stop escalated into repeated violations of Joe's constitutional rights, including unlawful detention and Withers pointing his firearm in retaliation for Joe's speech, all of which Withers knew, or any reasonable officer would have known, were unlawful. When Withers found cash in Joe's car, he "officially" arrested him, even though carrying currency is not a crime. Charges were never brought, but Joe was forced to hire a lawyer when the government tried to keep his money.

At booking, Joe was compelled to provide a DNA specimen. Under Utah's DNA Collection statute, a DNA specimen should be destroyed if criminal charges are not filed within 90 days after the booking. However, there is no mechanism in the statute for Joe or others to confirm whether a sample has been destroyed or when, or to compel the destruction.

The facts alleged in the Revised Amended Complaint, along with reasonable inferences, are more than sufficient to establish claims against Defendants Withers and Anderson.

## STATEMENT OF RELEVANT FACTS

As Defendants acknowledge, their motion must be decided based on the allegations in Plaintiff's complaint. Relevant facts from the Revised Amended Complaint include:

1. Compl. ¶ 8: On November 13, 2018 at approximately 2:30 p.m., Defendant Withers was driving in the left lane of Interstate 80 ("I-80") westbound near mile post 71, in Toole County.

2. <u>Compl. ¶ 9:</u> At that same time, Joe was driving his brown Toyota Avalon in the right lane of I-80 westbound near mile post 71.

3. <u>Compl. ¶ 10:</u> Withers proceeded forward in the left lane, gaining on the Avalon as if to pass, and then slowed.

4. <u>Compl. ¶ 11:</u> Joe was not violating any traffic laws at this time.

5. <u>Compl. ¶ 12:</u> Withers' dashcam reflects Withers remaining in the left lane for at least 30 seconds before steering his vehicle into the right lane behind Joe.

6. <u>Compl. ¶ 13:</u> Withers activated his patrol vehicle lights to signal Joe to pull over.

7. <u>Compl. ¶ 14:</u> Within two seconds, Joe pulled his vehicle over.

8. <u>Compl. ¶ 15:</u> It was obvious from its face that the license plate on Joe's car was not a Utah plate. Withers knew, and any reasonable Utah law enforcement officer would have known, that Joe's license plate had not been issued by the state of Utah.

9. <u>Compl. ¶ 16:</u> While still seated in his vehicle and before speaking with Joe, Withers called the plate into dispatch, stating, "I believe its AZ39390 Illinois."

10. <u>Compl. ¶ 17:</u> The sole alleged basis for Withers pulling Joe over, as stated in his subsequent report, was "an equipment violation."

11. <u>Compl. ¶ 19:</u> Withers got out of his vehicle and approached Joe's front passenger window.

12. <u>Compl. ¶ 20:</u> The following conversation occurred:

| Withers | Hey, the reason I'm stopping you is your plate frame you've got on your plate is completely covering the state where your plate is from. |
| Joe | It is? |
| Withers | Know what I mean? You wanna get out and look at it and I'll show you what I mean? |
| Joe | Yeah, that's fine. I just got this thing in September. |

13. <u>Compl. ¶¶ 21-22:</u> Joe handed his driver's license to Withers, who took it.

14. <u>Compl. ¶ 23:</u> Joe exited his vehicle and walked with Withers to the rear of the Avalon.

15. <u>Compl. ¶ 30:</u> The letters and numerals on Joe's plate (AZ 39390) were not obscured in any way.

16. <u>Compl. ¶ 33:</u> The conversation between Joe and Withers continued:

| | |
|---|---|
| Withers | See what I mean [about the frame]? |
| Joe | Yeah, it came from the dealership like that. |
| Withers | They put that plate frame on there? OK. Yeah, you know a lot of people don't think about that, but the way we look at it is, say this car is involved in some kind of crime or something and you can't read the plate, that causes a problem for us. |
| Joe | Yeah, I wish I would've noticed it because I would've known that was a problem. |
| Withers | Not a huge deal. Do you got a registration and insurance for this thing? |
| Joe | Oh, yeah. |
| Withers | You can hop back in. I'm not gonna be needing you out here again. |

17. <u>Compl. ¶¶ 34-35:</u> Joe returned to sit in the driver's seat of his vehicle. Withers returned to stand at the open passenger window.

18. <u>Compl. ¶ 36:</u> At this point, Withers' investigation into the alleged equipment violation had concluded. Withers had all the information he needed for an equipment citation.

19. <u>Compl. ¶ 37:</u> While Joe looked for his insurance information, Withers questioned Joe.

20. <u>Compl. ¶ 38:</u> The following conversation took place between Joe and Withers:

| | |
|---|---|
| Withers | Where you headed to today? |
| Joe | Uh, Reno. |
| Withers | What's in Reno? |
| Joe | Gambling. |
| Withers | Gambling in Reno. |
| Joe | Yeah. |
| Withers | Do ya got insurance on it? |
| Joe | Yeah, I do but it's Esurance. Do you want me to call my girlfriend? |

| | |
|---|---|
| Withers | Like, do you have some kind of proof of insurance, like on a phone or a card or—you gotta carry some kind of proof of insurance in the car. |
| Joe | It should be in an email. |
| Withers | You say you have an email with it? You have an electronic copy? Is that what you mean? |
| Joe | Yeah. |
| Withers | Will you turn the car off for me? I'd like you to come back to my car with me. I'm gonna have a few questions for you while you're looking for that. |
| Joe | Yeah, sure. |

21. <u>Compl. ¶ 39:</u> Joe turned off the engine, exited his vehicle, and walked with Withers toward the patrol vehicle.

22. <u>Compl. ¶¶ 40-41:</u> Before entering the patrol vehicle, Withers asked Joe to lift his shirt and turn in a circle to show he had no weapons in his waistband. Joe complied, lifting his shirt to expose his bare stomach and turning in a circle to show his bare back.

23. <u>Compl. ¶¶ 42-45:</u> Withers climbed into the driver's seat of the patrol vehicle, and Joe climbed into the front passenger seat. Once inside the patrol vehicle, Withers began plugging Joe's information into his computer. If Withers had been filling out a citation for the alleged equipment violation, the citation would have taken only a few minutes to complete. Instead of completing the citation, Withers began interrogating Joe about his travel plans and employment status.

24. <u>Compl. ¶¶ 46-47:</u> Withers then called Tooele County dispatch and had it run a driver's license and warrants check on Joe. Withers did not wait to hear back from dispatch. Instead, Withers told Joe to "hang tight" for a minute and exited the patrol vehicle.

25. <u>Compl. ¶ 48:</u> Joe did not believe he was free to leave.

26. <u>Compl. ¶¶ 49-51:</u> Withers opened the rear driver's side door and got out his K9, "Gus." He walked his dog up to Joe's Avalon, and had the dog conduct a purported sniff search around the exterior of the Avalon for approximately one minute.

27. <u>Compl. ¶¶ 52-56:</u>  The dog made three passes of the driver's side, five passes of the front side, two passes of the rear of the vehicle, and two passes of the passenger side, all without exhibiting conduct consistent with a K-9's retained final response.  Among other things, the dog never exhibited a "sit," the trained response.  Although not exhibiting a trained final response, the dog jumped and clawed at the outside of the vehicle's front passenger windshield and the passenger side rearview mirror.  The dog also jumped up, clawing the front passenger door, and attempted twice to enter the Avalon through the open front passenger side window.  The dog caused significant damage to Joe's Avalon ("raked the crap out of" the car and "destroy[ing] the door," as Withers later described it).  Withers returned to the patrol vehicle and placed the dog back in a kennel in the rear driver's side area.

28. <u>Compl. ¶ 57:</u> Later on during the stop, Withers took a cell phone call from someone he identified as "Jimmy."  Withers stated the following to Jimmy:

> Basically, the dog tried to jump—I mean the dog raked the crap out of the car twice trying to get through the passenger's window. He never gave a 'sit,' but there's no doubt in my mind he's trying to go after odor. And so after raking the hell out of the guy's paint twice, I was like, you know what? I'm just pulling it off of it. I mean, he's destroyed the door with his back feet trying to get into the car. He did kind of a half-ass indication after the first time when I yanked him out of the window, and then—I could see him hook odor, drop right back to the passenger window and try to bail through again. I'm like, 'ok, I'm calling that."

29. <u>Compl. ¶¶ 58-59:</u> Withers later wrote an incident report on his stop and search of Joe's vehicle. The report does not state that Gus alerted. Instead, it stated:

> His body tensed, his tail began wagging faster and his sniffing became more intense. He quickly worked back to the open window and truck jumping through it. I pulled him out of the vehicle and I watched him work odor back to the open window again trying to jump into the open window. It was obvious to me as his handler that he was following drug odor and was trying to get to the source of the odor as he is trained. In my experience with training and handling Gus, he will never try to jump through an open window of a vehicle unless he is trying to get to the source of drug odor. (See Jared

5

Withers Utah Highway Patrol Crime Report, Incident: U11024449, Report R14072685).

30. <u>Compl. ¶¶ 60-61:</u> Joe was still sitting in the patrol vehicle. Withers returned to the car, where he and Joe had the following conversation:

| | |
|---|---|
| Joe | Did you have to let him jump all over my car like that? |
| Withers | What that is, is he's trying to go after a drug odor, is what he's doing. |
| Joe | There are no drugs. |
| Withers | Well, if there are no drugs, there's something in there with drug odor on it because twice he tried to go into the car and I had to physically keep him out. |
| Joe | He's probably doing false hits. He's probably doing false hits like all you K9 cops do, cause there ain't been nothing smoked in that car and there ain't been nothing done in that car. |
| Withers | Well, I don't know that and he can't talk. All I know is he's a trained and certified narcotic detector dog and he's trying to go into your vehicle to get the drug odor, so. I'm gonna be searching your vehicle, ok. So I'm gonna have you go stand up in front of the car. |

31. <u>Compl. ¶ 62:</u> At this point, Joe continued to believe he was not free to leave.

32. <u>Compl. ¶¶ 63-66:</u> At Withers' instruction, Joe exited the patrol vehicle. Withers ordered Joe to place his cell phone on the hood of the patrol vehicle, which Joe did. Withers did not ask Joe about any other phones or other property on his person. Withers had already inspected Joe's person for any weapons.

33. <u>Compl. ¶¶ 67-70:</u> Withers pointed out a delineator post farther down the road, and directed Joe to stand by the post while Withers searched Joe's Avalon. Withers walked Joe to the post. Withers then left Joe at the post and walked alone, past the Avalon, back to his patrol vehicle.

34. <u>Compl. ¶ 71:</u> Joe did not believe he was free to leave.

35. <u>Compl. ¶ 72:</u> While retrieving gloves from the patrol vehicle, dispatch reported to Withers that Joe had no warrants and that Joe's driver's license was valid. At that point, Joe should

have been permitted to leave. The citation for an alleged equipment violation should have been completed, and Withers had no probable cause to continue detaining Joe or to search Joe's car.

36. <u>Compl. ¶¶ 73-74:</u> Withers walked back toward the Avalon but continued walking past the Avalon to Joe. As he approached Joe, he noticed that Joe had another cell phone. Withers recognized and knew that it was a phone in Joe's hand.

37. <u>Compl. ¶¶ 75-77:</u> Withers later told other UHP troopers that Joe could not hear him coming due to the noise of traffic. Withers approached Joe and demanded, "Let me see that!" Withers grabbed the phone from Joe's hand without giving Joe time to react or voluntarily comply with Withers' demand.

38. <u>Compl. ¶ 78:</u> Joe turned approximately ninety degrees to face Defendant Withers.

39. <u>Compl. ¶ 79:</u> With his left hand, Withers shoved Joe on the right side of Joe's chest causing Joe to take a step back. The shove was wholly unnecessary and not prompted by any legitimate law enforcement purpose or concern.

40. <u>Compl. ¶¶ 80-82:</u> Up to this point, Joe had been compliant and cooperative with every request and command Withers had made of him. After having his phone taken and being shoved for no reason, Joe began to feel increasingly frustrated and disrespected by Withers' orders and actions, the increasing delay in his trip, and the damage Gus had done to his car that Joe had bought only two months prior. Joe expressed these frustrations verbally.

| | |
|---|---|
| Joe | Fuck yourself, cock smoker! |
| Withers | Hey, you want that dog [Gus] to come out? |
| Joe | Oh, go ahead. I'd love to sue you. |
| Withers | How many more phones you have? |
| Joe | I'd love to sue you. |
| Withers | How many more phones you have? |
| Joe | Let the dog out. Let him bite me. |
| Withers | How many more phones do you have? |

| | |
|---|---|
| Joe | Fuck your mom! |
| Withers | Do you have more phones? |
| Joe | No, I don't. I don't have time for your fucking bullshit. |
| Withers | OK. Stay there. |

41. <u>Compl. ¶¶ 83-85:</u> Withers started walking back to the Avalon with his back turned to Joe, looking over his shoulder at Joe. Withers had taken approximately six steps away from Joe toward the Avalon when Joe shouted, "Fucking suck a dick!" Withers stopped walking.

42. <u>Compl. ¶ 86:</u> In response to Joe's declaration, Withers lost his temper. He was already irritated by Joe's comment about Withers' mother. In fact, Withers was so bothered that he brought up the comment later to another officer, stating "Dude, I don't like him much after he said what— about my mom. You know? I mean, that was like—dude, that was below the belt there."

43. <u>Compl. ¶ 87:</u> Withers drew his gun and aimed the gun at Joe's upper body.

44. <u>Compl. ¶¶ 89-91:</u> Withers shouted at Joe, "Get your hand out of your pocket!" Joe's hand was not in his pocket. He immediately put his hands in the air. Joe shouted, "I don't have anything. My hands are out of my pockets."

45. <u>Compl. ¶¶ 92-95:</u> Withers ordered Joe to turn around and put his hands on the back of his head. Joe complied. Withers handcuffed Joe with his hands behind his back. He told Joe, "You're not under arrest; you're being detained." This was a false statement. Joe believed he was not free to leave, nor was it physically possible for him to leave.

46. <u>Compl. ¶¶ 97-98:</u> After placing Joe in handcuffs, Withers walked Joe back to the patrol vehicle. Withers patted Joe down. Joe had no property or weapons on him.

47. <u>Compl. ¶¶ 100-102:</u> Withers placed Joe in the rear passenger-side seat of the patrol vehicle. The rear door had no interior door handles with which to exit the vehicle. Joe continued

to believe that he was not free to leave. Nor would it have been physically possible for him to leave, with his hands cuffed behind his back and in the back of a car with no interior door handles.

48. <u>Compl. ¶ 103:</u> Withers had arrested Joe without a warrant and without probable cause.

49. <u>Compl. ¶ 104-106:</u> Withers left Joe in the patrol vehicle. He walked to the front passenger door of Joe's Avalon, opened the door, and began to search Joe's vehicle.

50. <u>Compl. ¶¶ 107, 110-11:</u> UHP Trooper Jesse Williams ("Williams") arrived at the scene and joined Withers in searching Joe's Avalon. Withers' and Williams' search of the Avalon took 1 hour and 15 minutes, from 2:45 p.m. until approximately 4:00 p.m.

51. <u>Compl. ¶ 112:</u> Throughout the search, Joe was left with his hands cuffed behind his back in the back seat of Withers' vehicle.

52. <u>Compl. ¶ 114-116:</u> The Troopers located U. S. legal tender that Joe had secured in his vehicle. Withers advised Joe, "Ok, Joe. At this point you're being detained for the large amount of money that's in the car." There is no law against carrying legal tender.

53. <u>Compl. ¶¶ 118-119, 122:</u> No drugs or drug paraphernalia were found in Joe's vehicle. The Troopers took the cash. A total of $90,350.00 of Joe's money was seized.

54. <u>Compl. ¶ 120-124:</u> Withers transported Joe to the UHP office in Tooele County. Joe was booked into the Tooele County jail at 8:28 p.m. on November 13, 2018. On the citation, Withers wrote equipment violation, money laundering, and criminal conspiracy.

55. <u>Compl. ¶¶ 125, 131:</u> Because of Withers' reference to alleged felonies on the citation, for which Withers had no probable cause, Joe was forced to provide his DNA upon booking.

56. <u>Compl. ¶ 132:</u> No criminal charges were ever brought against Joe.

57. <u>Compl. ¶ 133:</u> Pursuant to Utah Code § 53-10-406(1)(i), the Bureau of Forensic Services (as an agency within the Department of Public Safety) "shall … destroy a DNA specimen obtained under this part if criminal charges have not been filed within 90 days after booking for an alleged offense under Subsection 53-10-403(2)(c)."

58. <u>Compl. ¶ 134:</u> Furthermore, under Utah Code § 53-10-406(1)(j), the Bureau of Forensic Services shall "make rules in accordance with Title 63G, Chapter 3, Utah Administrative Rulemaking Act, establishing procedures for obtaining, transmitting, and analyzing DNA specimens and for storing and destroying DNA specimens and other physical evidence and criminal identification information obtained from the analysis."

59. <u>Compl. ¶¶ 135-136:</u> Although obligated to destroy Joe's DNA specimen and otherwise make these rules, the Bureau has failed to track or destroy Joe's DNA specimen or promulgate administrative rules as required by the Legislature.  The Bureau has no system in place to track cases where it is required to automatically destroy DNA specimens pursuant to the statute.

60. <u>Compl. ¶ 137:</u> Utah Code § 53-10-406(6) provides that:

> A person whose DNA specimen has been obtained under this part may, personally or through a legal representative, submit to the court a motion for a court order requiring the destruction of the person's DNA specimen and any criminal identification record created in connection with that specimen if: (a) (i) a final judgment reverses the conviction, judgment, or order that created an obligation to provide a DNA specimen; or (ii) all charges arising from the same criminal episode for which the DNA specimen was obtained under Subsection 53-10-404.5(1)(a) have been resolved by a final judgment of dismissal or acquittal; and (b) the department determines that the person has not otherwise become obligated to submit a DNA specimen as a result of any separate conviction or juvenile adjudication for any offense listed in Subsection 53-10-403(2).

61. <u>Compl. ¶¶ 133, 138:</u> Despite this statutorily provided right, Utah's DNA collection statutes do not provide a mechanism by which Joe, and others similarly situated, may ensure the

destruction of their DNA where criminal charges are never filed. Additionally, because the Bureau has not promulgated rules as required by Utah Code § 53-10-406(1)(j), there is no administrative mechanism by which Joe may petition to ensure that his DNA specimen has been destroyed.

62. Compl. ¶¶ 140-141: Despite the absence of any criminal charges, on January 24, 2019, the State of Utah filed a civil action against Joe asking that Joe's money be "forfeited." Joe had to hire an attorney to defend against the State's attempt to keep his money.

63. Compl. ¶¶ 142-143: On March 7, 2019, Joe's attorney filed a motion to exclude all evidence. The motion argued that, among other things, Withers had no lawful basis to stop Joe. The State did not file any response attempting to justify the stop. Instead, on March 25, 2019, the State voluntarily dropped its forfeiture lawsuit and agreed to return Joe's money to him.

64. Compl. ¶ 144: Joes paid $18,070.00 to his forfeiture attorney, equaling 20% of the seized money. Joe also incurred other out-of-pocket expenses, including: $55.00 for UHP records through a GRAMA request; $250.00 jury demand fee in the forfeiture case; $25.00 wire transfer fee from Wells Fargo Bank; taxi fare to and money paid to impound lot; compensation to an attorney to confirm that Joe's DNA sample was handled as required by statute when charges were not brought within 90 days of booking; two seized cell phones and a new paint job for his car.

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

Joe is entitled to have a motion to dismiss determined by the allegations of his Complaint. Some facts recited in Defendants' Motion to Dismiss misstate or recharacterize those allegations, however. For example, Defendants say that the name of the issuing state on Joe' license plate was "fully covered" despite allegations and a photo showing it was only partially covered and Withers'

ability to decipher that it was Illinois.[2] Withers also rewrites allegations surrounding the second cell phone, use of unnecessary force, retaliation for Joe's speech, and the unlawful arrest.

For example, Defendants say that Joe used his second cell phone to make a call.[3] Nowhere in the Complaint is it alleged that Joe used the phone to make a call; nor do the dashcam or bodycam show that Joe was making a call. They reflect that Joe had a phone in his hands but do not indicate what action, if any, was occurring with the phone. Withers' motion further omits the fact that, after snatching the phone from Joe, Withers escalated the encounter into a physical altercation by shoving Joe backward. It was only after this physical assault that Joe responded by raising his voice at Withers.

After Withers took Joe's phone and began walking away, Withers claims he saw Joe move a hand toward his pocket, allegedly causing Withers to feel threatened.[4] This convenient subjective assertion is outside the complaint, and omits facts in the Complaint suggesting otherwise. For example, Withers had previously searched Joe and determined he did not have a weapon[5], and Joe had been cooperative with all of Withers' commands at the time Withers drew his firearm.[6]

Finally, Defendants' Motion mischaracterizes Joe's arrest by avoiding specifying the moment when the arrest occurred. Defendants imply that the arrest came only after the money was found[7], ignoring that, by that point, Joe had been subjected to the use of a firearm, handcuffs, a prolonged detention, and physical confinement from which it was not possible for Joe to leave.

---

[2] *See* Defendant's Motion at ¶¶ 4-5.
[3] *See* Defendant's Motion at ¶ 14.
[4] The bodycam video is not clear what Joe was doing with his hands, but for the purpose of this memorandum it would not matter if Joe was making a phone call.
[5] *See* Complaint ¶¶ 35-36.
[6] *See* Complaint ¶ 75.
[7] *See* Motion to Dismiss at 19, ECF No. 11.

## LEGAL STANDARD

In reviewing a motion to dismiss, the court assumes true all well-pleaded allegations and draws all reasonable inferences in a light most favorable to the plaintiff.[8] In determining the plausibility of a claim, the court "keep[s] in mind that the Rule 12(b)(6) standard does not require a plaintiff to 'set forth a prima facie case for each element.'"[9] Rather, a plaintiff need only nudge his claims "across the line from conceivable to plausible."[10] "Granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."[11]

## ARGUMENTS

## I.  UNDER THE ALLEGATIONS OF THE COMPLAINT, A JURY ISSUE EXISTS AS TO THE VIOLATION OF JOE'S FOURTH AMENDMENT RIGHTS

"Judicial review of police-citizen encounters should proceed in a step-by-step fashion, focusing on each stage of the encounter," and "courts must insure that the requisite level of suspicion or cause is present at each stage of the encounter."[12] The Fourth Amendment guarantees the right of the people to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[13] In reviewing Fourth Amendment claims, a court asks whether the officer's actions were objectively reasonable under the totality of the

---

[8] *Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011).

[9] *George v. Urban Settlement Services*, 833 F.3d 1242, 1247 (10th Cir. 2016) (*citing Khalik v. United Air Lines*, 671 F.3d 1188, 1192-93 (10th Cir. 2012)).

[10] *Smith v. U.S.*, 561 F.3d 1090, 1103-04 (10th Cir. 2009)(also citing *Bryson v. Gonzales*, 534 F.3d 1182, 1286 (10th Cir. 2008)("This is not to say that the factual allegations must themselves by plausible; after all, they are assumed to be true.  It is just to say that relief must follow from the facts alleged.")).

[11] *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (cleaned up).

[12] *United States v. Esteban*, 283 F. Supp. 3d 1115, 1127 (D. Utah 2017).

[13] U.S. Const. Amend. IV.

circumstances.[14] At the motion to dismiss stage, where a fulsome review of the totality of the circumstances is not possible, an officer may not be entitled to qualified immunity.[15]

Defendants argue Joe's claims fail because the stop, sniff, search, and arrest were all constitutional.[16] Defendants further argue that even if there was a constitutional violation the constitutional right was not clearly established at the time.[17] These arguments fail as follows.

## A. The traffic stop violated Joe's Fourth Amendment rights.

A routine traffic stop is considered a seizure which implicates the protections of the Fourth Amendment.[18] Courts analyze the reasonableness of a traffic stop with a dual inquiry, asking (1) whether the stop was justified at its inception and (2) whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place.[19]

### 1. The traffic stop was not justified at its inception.

For a traffic stop to be justified at its inception an officer must have a reasonable suspicion that a motorist has violated an applicable traffic or equipment regulation of the jurisdiction.[20] Reasonable suspicion requires "something more than an inchoate and unparticularized suspicion or hunch."[21] In evaluating the validity of a stop based on reasonable suspicion, the Supreme Court directs that courts consider "the totality of the circumstances—the whole picture."[22]

---

[14] *United States v. Chavez,* 660 F.3d 1215, 1221 (10th Cir.2011).
[15] *Parkinson v. Sanderson*, No. 2:15-CV-796, 2018 WL 4688351, at *7 (D. Utah Sept. 28, 2018).
[16] *See* Defendant's Motion to Dismiss at 9-10, ECF No. 11.
[17] *Id.* at 10
[18] *United States v. Trestyn*, 646 F.3d 732, 741 (10th Cir. 2011).
[19] *Id.* at 742.
[20] *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).
[21] *United States v. Chavez,* 660 F.3d 1215, 1221 (10th Cir.2011).
[22] *United States v. Cortez*, 449 U.S. 411, 417 (1981).

Defendants argue the traffic stop was justified because Withers had reasonable suspicion that Joe was in violation of Utah law.[23] Withers claims to have based the stop on Utah Code § 41-1a-404(3), which states in part, "Every license plate shall at all times be . . . maintained . . . in a condition to be clearly legible."[24] There are several problems with Defendants' argument. First, it is clear from the statute that Part 4 (of Title 41 chapter 1a) addresses only license plates issued by the Utah Division of Motor Vehicles.  § 202 of the Motor Vehicle act expressly exempts vehicles registered in another state and owned by a nonresident from Utah's registration requirements.[25] Part 4 begins with § 401, which addresses physical characteristics of license plates issued to Utah registrants, such as metals and reflective material.[26] § 402 prescribes required content for "license plates." Although § 402 does not repeat that it is addressing only the design of Utah-issued plates, it is obvious from its text, including the requirement that license plates contain a "Ski Utah" or centennial slogan.[27] § 403 continues with design specifications, addressing the size of imprinted material:  "License plates and the required letters and numerals on them, except the decals and the slogan, shall be of sufficient size to be plainly readable from a distance of 100 feet during daylight." This, again, is a direction to the Division regarding the design of Utah plates.

Consistent with § 202(2)(a) and all other provisions of Part 4, § 404 is also directed at Utah-issued plates. For example, § 404 begins by requiring "license plates" to be affixed to the

---

[23] *See* Motion to Dismiss at 10, ECF No. 11.
[24] Utah Code § 404(3)(b)(ii).
[25] Utah Code § 41-1a-202(2)(a).
[26] Utah Code § 401 (addressing reflective material, contracts for manufacture, etc.)
[27] Utah Code § 402 (requiring plates to have coloring approved by Utah Division, to include a Ski Utah or centennial slogan, etc.)  By contrast, Illinois plates require an image of Abraham Lincoln, as shown on the photograph.

front and rear of a vehicle, whereas 20 states do not require front plates.[28]  Following § 404 are 13

more provisions of Subchapter 4, every one of which is limited to Utah-issued plates.[29] This is

only logical:  Utah has no authority to regulate the license plates issued outside of its jurisdiction,

and it would be burdensome for drivers driving through Utah – or other states – to become

informed of and comply with license plate requirements of a state other than their state of domicile.

In short, § 404 does not apply to Illinois-based licensed plates.

Defendants' argument would fail even if § 404 did purport to regulate the conduct of an

out-of-state owner with out-of-state plates on an interstate highway.  As noted, § 404's visibility

provision is limited to "letters and numbers," a term the Motor Vehicle Act uses to refer to a license

plate's registration number, the unique combination of letters and numbers assigned to a vehicle.[30]

Moreover, § 404(5) makes allowances in the visibility requirement, with exceptions for trailer

hitches, wheelchair lifts, trailers, bicycle racks, and other cargo carrying devices.

Joe was not in violation of § 404. Plaintiff's facts allege that the "required letters and

numerals" on Joe's license plate were clearly visible. It was only the name of the state which

Defendants argue was not visible—though Withers had no trouble discerning the state of origin

when he called in the license plate and the bottom portion of the letters "Illinois" are visible.[31]

Additionally, a license plate frame falls in the same category as § 404(5) exceptions.[32] A rear-

---

[28] Thom Taylor, *Ohio Just Killed Front License Plates: Now All States need to Follow*, MotorBiscuit (July, 1, 2020), https://www.motorbiscuit.com/ohio-just-killed-front-license-plates-now-all-states-need-to-follow/.

[29] For example, §§ 411, 412, & 413 speak to the application for, design of, and transfer of personalized license plates through the Utah Division of Motor Vehicles; §§ 418, 419, 420, 421, & 422 all speak to the Utah Division of Motor Vehicle issuance of special group license plates.

[30] *See* Utah Code §§ 41-1a-411 & -419(1)(b)(i)(D).

[31] Revised Amended Compl. at ¶ 16.

[32] *United States v. Flores*, 798 F.3d 645, 648 (7th Cir. 2015).

mounted trailer can permissibly obstruct the letters and numbers of a plate. By contrast, the dealer plate on Joe's car ran the periphery of the plate leaving the letters and numbers visible and only obstructing a part of the place origin.

Withers knew, and any reasonable officer would know, that § 404 did not apply to an Illinois-issued plate, and that Utah's Motor Vehicle Act does not require the state name to be visible. Because Joe was not in violation of Utah Code § 404(3)(b)(ii), Withers had no reasonable basis for the stop.

### 2. Withers' alleged interpretation was not a reasonable mistake of law

Reasonable suspicion can rest on a reasonable mistake of law.[33] "An officer's subjective understanding of the law is irrelevant; the mistake of law must be *objectively* reasonable."[34] This inquiry is not as forgiving as the qualified immunity analysis. "[A]n officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce.[35]

The present case is analogous to *United States v. Flores* in which an Illinois officer stopped an out-of-state driver under the premise that the plate frame was covering the state the plate was from.[36] On appeal, the driver challenged the reasonableness of the stop under the Illinois plate-display statute when the letters and numbers of the plate was clearly visible. The language of the applicable Illinois statute is nearly identical to § 41-1a-404(3). The Seventh Circuit vacated and remanded, holding that the driver was not in violation of the statute and it was not reasonable for the officer to conclude that a plate frame violated the statute. The court noted that if the officer's

---

[33] *Heien v. North Carolina*, 574 U.S. 54, 60-61(2014).
[34] *United States v. Cunningham*, 630 F. App'x 873, 877 (10th Cir. 2015) (emphasis in original).
[35] *Id*.
[36] 798 F.3d 645 (7th Cir. 2015).

interpretation were reasonable "it would justify stopping any of the vast number of cars driven lawfully but affixing plates with the ubiquitous frames like the one in this case."[37]

Defendants argue that even if Withers did not have authority to pull Joe over for a violation of § 403, he is entitled to qualified immunity because his action was based on a reasonable mistake of law.[38] That is incorrect. First, Withers did not make a mistake of law because (as alleged) he did not believe Joe had committed a plate violation; that was solely a pretext to stop a single male out-of-state driver hoping to find money to "forfeit."[39] Further, it is unreasonable on its face – and contrary to the text and context of Part 4 – to (allegedly) believe that Utah has authority to regulate license plates issued by another state. It is likewise unreasonable to claim that § 404(5) would create an exception allowing obstruction of the numbers and letters of a plate but prohibit obstruction of the place or origin. Were Withers' interpretation adopted, it would allow for approximately one-third of Utah drivers to be stopped solely because of their license plate frames.[40] Considering the enormous number of drivers this would impact, it is clear that most— presumably reasonable—officers do not interpret 404(3) as Withers claims to.

Defendants argue that Withers' alleged mistake of law was reasonable because the provision is ambiguous and has not been interpreted by a Utah appellate court.[41] This argument fails because – as noted above – *every single provision* of Part 4 is limited on its face to Utah-

---

[37] *Id.* at 650.
[38] *See* Motion to Dismiss at 16, ECF. No. 11.
[39] This budget-supplementation method appears to be popular with UHP officers. *See, e.g.*, *Savely v. Utah Highway Patrol*, 2018 UT 44 (UHP pulls over vehicle, finds no drugs or contraband, nonetheless seeks to keep $500,000 found in car).
[40] Plaintiff's investigator conducted a survey and found that approximately one third of Utah vehicles have license plate frames that obscure part or all of the name of the state. *See* Revised Amended Compl. ¶ 31.
[41] Motion to Dismiss at 26, ECF No. 11.

issued plates. Moreover, the statute has been interpreted by a Utah court in *State v. Hartman*.[42] Defendants seek to diminish the *Hartman* holding by emphasizing that the case was not before an appellate court. However, the case law on reasonable mistakes of law does not require that the relevant interpreting court be an appellate court.[43] To the contrary, the Supreme Court has protected police officers' reliance on lower court cases.[44] Where the courts protect such reliance, officers should not be permitted to ignore relevant case law and thereby gain a Fourth Amendment advantage.[45] *Hartman* is distinguishable from Defendants' citations in that the Utah court opinion is factually on all fours with this case, and there is no court split. Any claimed misunderstanding of the law was unreasonable.

Even if Withers' interpretation of 404(3) had been reasonable, it was unreasonable for him to stop Withers solely for such a violation. § 404 provides that an officer may only enforce subsection 1 (requiring two license plates, one in the front and one in the rear) as a secondary action when the vehicle has been detained for some other suspected violation. The risk alleged by a partially obscured state of origin (that a vehicle might be more difficult for law enforcement to identify) is far greater with a missing second plate, yet officers may not stop a vehicle solely on that justification. A reasonable officer would have known that, since he could not pull Joe over if a second plate was entirely missing, he could not pull Joe over because the state name on the second plate were partially obscured.

---

[42] No. 141500407 (Utah 3d Dist. June 19, 2015).
[43] *United States v. Vance*, 893 F.3d 763, 771 (10th Cir. 2018)(examining but declining to follow state opinions); *United States v. Cunningham*, 630 F. App'x 873, 878 (10th Cir. 2015)(examining the split holdings of state courts).
[44] *Pearson v. Callahan*, 555 U.S. 223, 244–45 (2009) ("Police officers are entitled to rely on existing lower court cases without facing personal liability for their actions.").
[45] *See* infra n. 35 and accompanying text.

### 3. Reasonable suspicion is defeated because Withers treated Joe differently than other drivers in enforcing Utah Code § 41-1a-404(3).

When an officer acts with the requisite level of cause for seizing a person, claims of a constitutional violation are generally defeated.[46] However, when a person can show that an officer took action against an individual when other officers typically exercise their discretion not to do so, cause is defeated. The Supreme Court illustrated this qualification with the example of an individual who is arrested for jaywalking after complaining about police conduct. "[J]aywalking is endemic," the Court observes, "but rarely results in arrest."[47]

To satisfy this qualification on a motion to dismiss, a plaintiff must allege facts from which an inference can be drawn that he was seized when similarly situated individuals have not been seized. Upon such a showing, a plaintiff's claim may proceed in the same manner as where the plaintiff has met the threshold showing of an absence of cause.[48] Among other things, Joe alleges that an investigator conducted a study of vehicles on the road in Utah, and found that approximately one third of vehicles have license plate frames that obscured part or all of the name of the state – including frames promoting Utah's public universities, sports teams, and car dealerships.[49] Although statistics are not available pre-litigation regarding plate frame stops, it is reasonable to infer that, if § 404 were enforced, even sporadically, in the manner claimed by Withers then there would not be such a prevalence of obscuring plate frames in Utah. Subject to discovery, an inference can be drawn that Joe was treated materially differently from other drivers

---

[46] *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019).
[47] *Id*.
[48] *Id*.
[49] *See* Revised Amended Compl. ¶ 31.

on Utah roads, and his claim may proceed as though he had shown an absence of reasonable suspicion.

Defendants' Motion appears to misapprehend the nature of Plaintiff's selective enforcement argument. Plaintiff invokes selective enforcement for the jurisprudence of defeating probable cause on his Fourth Amendment claim, not for the purpose of asserting an Equal Protection claim. For this reason, Defendants' arguments regarding discrimination are irrelevant.[50]

### B. Withers' actions were not reasonably related in scope to the investigation of the alleged equipment violation.

A stop that is justified at its inception may become an unlawful detention if the officer's actions become unreasonable in scope.[51] An officer must release a driver upon issuing a citation or returning paperwork, absent consent or reasonable suspicion that would justify continuing the stop.[52] The reasonableness of an "officer's conduct is evaluated according to whether the duration of the stop was reasonable, whether the detained person had the ability to leave or end the encounter, and whether the detained person was transported during the period of detention."[53]

Plaintiff has pled sufficient facts to infer that the duration of the stop became unreasonable. Due to Withers' specific instructions to Joe, Joe was not free to leave and Joe did not feel free to leave or end the encounter.

### 1. The dog sniff was a violation of Joe's Fourth Amendment rights because Withers exceeded a reasonable duration for the stop.

---

[50] *See* Motion to Dismiss Revised Amended Compl. at 8, ECF No. 23.

[51] *United States v. Gonzalez*, 106 F.3d 414 (10th Cir. 1997)

[52] *United States v. White*, No. 05-40114-01-SAC, 2006 WL 1360165, at *6 (D. Kan. May 17, 2006), aff'd, 584 F.3d 935 (10th Cir. 2009).

[53] *Id.* (*citing Florida v. Royer*, 460 U.S. 491, 504–06, (1983)); *Rodriguez v. United States*, 575 U.S. 348, 358 (2015) (remanding for a factual determination of whether a reasonable suspicion of criminal activity justified detaining a driver beyond the completion of the traffic infraction investigation).

Permissible duration for a police inquiry during a traffic stop is determined by the stop's "mission" – to address the traffic violation that warranted the stop and attend to related safety concerns. (Alleged) violation of Utah Code § 41-1a-404 is an infraction. Because addressing a minor equipment violation is the alleged purpose of the stop, "it may last no longer than is necessary to effectuate that purpose."[54] Authority for a stop ends when the tasks tied to the traffic infraction are, or reasonably should have been, completed.[55] "[A]n officer's diligence in conducting a stop is not solely measured by the stop's duration. Rather, the court must also scrutinize "what the officer actually did and how he did it."[56] The key question is not whether an unrelated inquiry, like a dog sniff, occurs, but whether the unrelated conduct adds time to the stop.

The scope of a traffic stop must also be carefully tailored to its underlying justification.[57] While an officer may perform inquiries incident to the traffic stop as part of his mission, a dog sniff is not fairly characterized as part of an officer's traffic mission.[58] While the use of a dog during the course of a lawful traffic stop does not implicate privacy interests under the Fourth Amendment, a "dog search of a vehicle that is conducted while the vehicle is being unlawfully

---

[54] *Rodriguez*, 575 U.S. at 354.

[55] *Id.*; *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605 (1985)("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.").

[56] *United States v. Esteban*, 283 F. Supp. 3d 1115, 1131 (D. Utah 2017).*Id.*

[57] *Fla. v. Royer*, 460 U.S. 491, 500 (1983); *United States v. Trestyn*, 646 F.3d 732, 742 (10th Cir. 2011) (holding that a constitutional stop must remain reasonably related to the scope of the circumstances precipitating the stop).

[58] *Rodriguez*, 575 U.S. at 355-56.

detained implicates the Fourth Amendment in the same manner as any other search conducted in conjunction with any other improper seizure."[59]

This case is analogous to *United States v. $85,688.00 in U.S. Currency*, in which an officer stopped an out-of-state driver for a suspected vehicle registration violation.[60] During the stop, the officer learned the vehicle was lawfully registered, at which time suspicion of a violation dissipated. The officer nevertheless continued to detain the driver and conducted a dog sniff, which led to discovery of a large sum of money and an arrest (and, of course, a forfeiture claim to keep the money). On appeal of the forfeiture claim, the Tenth Circuit held that evidence from the search must be suppressed because the driver was detained beyond the dissipation of reasonable suspicion which justified the original stop.

Defendants ask the Court to rule as a matter of law that the dog sniff did not unreasonably extend the duration of the stop.[61] But under the facts pled, Withers was not diligent in completing the original purpose for the stop and prolonged Joe's detention. The Complaint notes that after obtaining Joe's driver's license and showing Joe the license plate frame, Withers had all the information necessary to issue an equipment violation. If Withers had diligently pursued completing the equipment citation, he would have promptly returned to his patrol vehicle, called Joe's information into Tooele County dispatch, and completed the paperwork of the citation. The citation consists of simple fields any reasonable officer could have filled out within the time that it took to check on Joe's information.[62]

---

[59] *Lange v. City of Grand Junction*, Colo., No. CIV 08-CV-02049-LTB, 2009 WL 1362636, at *5 (D. Colo. May 14, 2009).
[60] 577 F. App'x 811 (10th Cir. 2014).
[61] *See* Motion to Dismiss at 17, ECF No. 11.
[62] These fields consist of straightforward information such as driver's name and address, the

Withers did not diligently call in Joe's information or complete the citation. Instead, he purposely delayed, continuing to ask Joe questions unrelated to investigation of a license plate frame violation. Withers asked Joe to join him in his patrol vehicle, performed a weapons inspection of Joe, continued asking unnecessary questions, and performed the dog sniff. Indeed, Withers waited more than five minutes into the stop before finally calling in Joe's information.

Defendants cite *United States v. Smith* for the proposition that a dog sniff is valid if it does not prolong the stop.[63] *Smith* involved another dog sniff by Defendant Withers. In that case, the court ruled that the stop was constitutional because Withers conducted the dog sniff before hearing back from dispatch on the driver's information. In *Smith*, however, Withers promptly called dispatch to relay the driver's information.[64] In this case (perhaps having learned from *Smith* that delaying the receipt of information from dispatch is important), Withers drew out the clock by waiting to call in the information and during that delay did not pursue completing the citation. After Wither had bought himself time to delay results from dispatch, he then conducted the dog sniff. Based on these facts, an inference could be drawn that Withers unlawfully prolonged the duration of the stop.[65]

---

vehicle make and model, and the traffic violation and Utah code provision.
[63] Motion to Dismiss Amended Compl. at 28, ECF No. 23; *United States v. Smith*, No. 2:16-cr-0020-DN, 2016 WL 4761315 (D. Utah Sept. 12, 2016).
[64] *Smith*, 2016 WL 4761315, at * 2 ("Once Trooper Withers was back in his car, he called dispatch . . . ").
[65] *Lange v. City of Grand Junction*, Colo., No. CIV 08-CV-02049-LTB, 2009 WL 1362636, at *5 (D. Colo. May 14, 2009) (denying a motion to dismiss on the grounds of qualified immunity because plaintiff had sufficiently pled that a stop was unjustified at its inception and  that the stop was prolonged for an excessive amount of time.).

### 2. The stop became unreasonable because Joe did not feel free to leave.

A seizure occurs when an individual has objective reason to believe that he is not free to terminate an encounter with an officer and proceed on his way.[66] The Tenth Circuit follows a bright-line rule that an encounter may not be deemed consensual unless the driver's documents have been returned to him.[67] Under the facts plead, the stop was an unlawful detention. Plaintiff's Complaint repeatedly notes that throughout the encounter with Withers Joe did not feel free to leave. He gave his driver's to Withers at the beginning of the stop and did not get it back. He was also ordered to stand in a specific spot. And, according to Withers himself, Withers prohibited Joe from receiving or making any phone calls.

Under the facts and Tenth Circuit precedent, it is a reasonable inference that Joe did not feel free to end the encounter. Further, after Withers placed Joe in handcuffs and placed him in the back of the police vehicle, it became physically impossible for Joe to leave or end the encounter.

### C. Withers' search of Joe's vehicle was not supported by probable cause.

Searches conducted outside the judicial process are presumptively unreasonable under the Fourth Amendment; thus, an officer must affirmatively establish probable cause to justify a warrantless search.[68] In this circuit, a positive dog alert may give an officer probable cause.[69] However, interpretation of an alert should not be subjectively inferred.[70] The Supreme Court has noted that the Fourth Amendment requires circumstances that, viewed *objectively*, justify a

---

[66] *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308 (10th Cir. 2006).
[67] *Id*.
[68] *Arizona v. Gant*, 556 U.S. 332, 338 (2009) *citing Katz v. United States,* 389 U.S. 347, 357 (1967).
[69] *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009).
[70] *United States v. Esteban*, 283 F. Supp. 3d 1115, 1136-37 (D. Utah 2017).

search.[71] "Were it otherwise, an experienced police officer's recitation of some facts, followed simply by a legal catchphrase, would allow the infringement of individual rights with impunity."[72]

Under the facts of the Complaint, Withers' dog never alerted.[73] Defendants claim that Withers subjectively (and conveniently) recognized the dog's actions as some sort of indication, that the dog gave an involuntary response that provided probable cause.[74] This assertion is, of course, outside the allegations of the Complaint, which alleges the absence of an alert and post-hoc attempts to justify the search by Withers. Absent an objective alert, Withers had no probable cause for the search of Joe's vehicle.[75]

### D. Withers lacked probable cause to arrest Joe.

The Tenth Circuit has identified three types of police citizen encounters.[76] The two types at issue in this case are a *Terry*-type stop (also known as an investigative detention) and an arrest. A *Terry* stop is a brief, non-intrusive detention during a preliminary questioning.[77] An arrest, by contrast, is an involuntary, highly intrusive or lengthy search or detention.[78] "The use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention

---

[71] *Id.*, *quoting Kentucky v. King*, 563 U.S. 452, 464 (2011).

[72] *Id.*, *quoting United States v. Williams*, 808 F.3d 238, 253 (4th Cir. 2015).

[73] Revised Amended Compl. at ¶¶ 52, 53, 57

[74] Motion to Dismiss at 18, ECF No. 11.

[75] At this point, all Withers knew about Joe were his travel plans and employment status, neither giving rise to probable cause for a search. *See United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997) (holding that traveling while unemployed does not give rise to a reasonable suspicion of criminal activity); *United States v. Simpson*, 609 F.3d 1140, 1149 (10th Cir. 2010) (holding that implausible travel plans may serve as a basis for reasonable suspicion, but stating that courts are reluctant to deem implausible plans which are merely unusual or strange because they are not the choice a typical person, or the officer, would make).

[76] *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir. 1984).

[77] *Id.*

[78] *Id.*; *See Cortez v. McCauley*, 478 F.3d 1108, 1115-16 (10th Cir. 2007).

and enter the realm of an arrest."[79] An officer may arrest a person without a warrant if the officer has probable cause to believe the person committed a crime.[80] "Probable cause exists if the facts and circumstances within the arresting officer's knowledge and of which [the officer] has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."[81]

A large amount of hidden legal tender in itself is not probable cause for an arrest.[82] It may only be considered evidence of an illicit connection to drug trafficking (and therefore probable cause for an arrest) when the currency is combined with other persuasive evidence, such as drugs, drug paraphernalia, or notebooks containing notations of large drug transactions.[83]

Defendants ask the Court to rule as a matter of law that Withers had probable cause for the warrantless arrest.[84] But Defendants' contention that legal tender provides probable cause fails from the outset because Joe was arrested prior to discovery of the cash.[85] Defendants' motion does not address Plaintiff's allegations that he was arrested prior to the search (and the argument cannot be made for the first time in a reply). Plaintiff's Complaint notes that, among other things, Withers forced Joe to stand at a specific location, pointed his firearm, handcuffed Joe's hands behind his

---

[79] *Cortez*, 478 F.3d at 1116 (cleaned up); *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (holding that an investigatory stop was transformed into a custodial arrest because officers when officers displayed firearms and used handcuffs without circumstances or information that would justify such measures).

[80] *Cortez*, 478 F.3d at 1115.

[81] *Id*.

[82] *United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two & 43/100 Dollars ($149,442.43) in U.S. Currency*, 965 F.2d 868, 877 (10th Cir. 1992).

[83] *Id*. This necessity should be obvious even if a dog had alerted, considering the well-known fact that a high percentage of cash contains traces of cocaine or other narcotics.

[84] Motion to Dismiss at 20, ECF No. 11.

[85] *Cortez v. McCauley*, 478 F.3d 1108, 1130 (10th Cir. 2007) ("an unreasonable level of force transforms a Terry detention into an arrest requiring probable cause.").

back, and patted him down. Withers also physically confined Joe in the back seat of the patrol vehicle for approximately 25 minutes before Withers claimed to "officially" arrest Joe.[86] In fact, when Withers said he was arresting Joe, he made no change to Joe's physical condition because Joe was already cuffed and confined in the patrol vehicle.

Even if a jury found that Joe was not arrested until after the cash was found, there was still no probable cause. Carrying a large sum of legal tender is not a crime, whether or not it is hidden. (Indeed, if one is carrying a large sum of cash or other valuables while traveling out of state, it would seem foolish not to conceal it.) Plaintiff's facts – and the absence of any criminal charges – reflect the lack of corroborative evidence that would provide probable cause to believe the money was involved in illicit trafficking. Without more, Withers had no probable cause to arrest Joe.

### E. Withers violated Joe's clearly established Fourth Amendment rights.

Qualified immunity only shields government officials from liability if the official's challenged conduct did not violated a clearly established constitutional right.[87] To establish that a right is clearly established, courts do not require a case that is directly on point; the existing precedent must place the statutory or constitutional question beyond debate.[88] In recent years, the Supreme Court has cautioned lower courts not to define "clear establishment" at too high a level of generality.[89] However, a case with the same facts need not be cited.[90] Rather, the "precedent

---

[86] Counting from the time Joe was handcuffed until Withers delivered Joe to Tooele UHP headquarters, Joe was detained for an hour and fifteen minutes.
[87] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).
[88] *White v. Pauly*, 137 S. Ct. 548, 551 (2017).
[89] *Id.*
[90] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42, (2011)) (a "case directly on point" is not required to find that a right is clearly established); *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) ("We do not engage in 'a scavenger hunt for prior cases with precisely the same facts' but examine whether the law put

must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."[91] General statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.[92] To show prior notice that the complained of conduct was unconstitutional, the Tenth Circuit allows the combining of older, pre-cautionary precedents to clearly establish the law.[93]

"[T]he salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional."[94] For example, in *Vette*, the defendant allegedly sicced his dog on the plaintiff after the plaintiff had been subdued. There had been no prior Tenth Circuit cases with similar facts, but the Tenth Circuit agreed that qualified immunity did not apply because as of 2017, "our precedent was clear that continued use of force after an individual has been subdued is a violation of the Fourth Amendment."[95]

---

officials on fair notice that the described conduct was unconstitutional.").

[91] *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (emphasis added).

[92] *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (alteration in original) (*quoting Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *Truman v. Orem City*, 1 F.4th 1227 (10th Cir. 2021) ("There can also be "the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.").

[93] *See McCoy v. Meyers*, 887 F.3d 1034, 1052-53 & nn.22-24 (10th Cir. 2018).

[94] *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1171 (10th Cir. 2021) (cleaned up, citations omitted)

[95] *See also See also Dalton v. Reynolds*, No. 19-2047, 2021 WL 2641859 (10th Cir. June 28, 2021) (affirming denial of qualified immunity where defendant allegedly provided less protection to a victim because her partner was a law enforcement officer; although there were no prior cases where the victim was a partner of a police office, court had recognized right in cases involving other subclasses of victims); *Truman v. Orem City*, 1 F.4th 1227 (10th Cir. 2021) (right not to be convicted by fabricated evidence was clearly established; "The alleged facts in this case are obviously not identical to those in *Pierce*: prosecutor versus forensic analyst, incorrect dimension evidence versus faulty hair sample evidence. Even so, there are consistent factual strands running through these cases that put the prosecutor on notice that his alleged conduct violated Mr. Truman's constitutional rights. Just like in *Pierce*, Mr. Truman alleges that the prosecutor knowingly used false evidence to convict Mr. Truman and to deprive him of due process. Such consistency is enough to defeat qualified immunity.").

Defendants argue that Withers is entitled to qualified immunity on Joe's Fourth Amendment claims because he did not violate any clearly established rights.[96] Contrary to Defendants' arguments, Withers violated Joe's clearly established rights at every stage of the traffic stop. The Tenth Circuit has expressly held that a traffic stop which is not justified at its inception by reasonable suspicion of a traffic violation, equipment violation, or other criminal activity is a violation of the Fourth Amendment.[97] This is a clear, specific principle that Withers does not claim varies by case-specific facts.

It is also well established that an officer may not prolong the duration of a stop without reasonable suspicion.[98] And it is long settled warrantless searches are presumptively unreasonable under the Fourth Amendment.[99] Because of this presumption, searches without a warrant are permitted in only a few specifically established and well-delineated exceptions, and the party seeking an exemption from a warrant carries the burden of showing the need for it.[100] This presumption shifts the burden to the Defendants to show that Withers' warrantless search of Joe's vehicle falls within an exemption and the need for the exemption to apply.

---

[96] Motion to Dismiss at 20, ECF No. 11.

[97] *See United States v. Martinez*, 910 F.3d 1309, 1313 (10th Cir. 2018) (holding that a traffic stop was not justified at its inception when an officer did not observe any traffic or equipment violations nor did the officer have a particularized and objective suspicion of criminal activity before initiating the stop).

[98] *United States v. Trestyn*, 646 F.3d 732, 742 (10th Cir. 2011) (holding that an officer had violated the Fourth Amendment by unreasonably prolonging a traffic beyond the dissipation of reasonable suspicion of the original purpose of investigating an equipment violation and without additional reasonable suspicion). ). *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) (holding that an officer's continued detention of a driver after satisfaction of the original purpose of the stop was a violation of the Fourth Amendment).

[99] *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (holding that warrantless searches are per se unreasonable under the Fourth Amendment subject to a few well-delineated exceptions).

[100] *Id.; United States v. Jeffers*, 342 U.S. 48, 51 (1951).

With regard to excessive force, when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, the court does not require a second decision with greater specificity to clearly establish the law.[101] Individuals have a clearly established right to be free from the use of excessive force, especially when the officer had reason to know a person is not armed and the person is not a threat or otherwise resisting.[102] Finally, it is a clearly established that a warrantless arrest without probable cause is a violation of the Fourth Amendment.[103] Any reasonable officer would have known that actions, such as Defendant Withers violated Joe's clearly established rights.

On review of this motion to dismiss, if the totality of the circumstances are not clear as to whether Joe's rights were violated, this court should permit Joe's Fourth Amendment claims to proceed for the purpose of allowing a fulsome review of the circumstances. If Defendants claim that some fact was present in this case that made application of these settled principles uncertain, the Court can revisit their entitlement on summary judgment.

---

[101] *Davis v. Clifford*, 825 F.3d 1131, 1136 (10th Cir. 2016).

[102] *See Dixon v. Richer*, 922 F.2d 1456, 1464 (10th Cir. 1991) (holding officers had violated plaintiffs' clearly established rights when officers used physical force against a detainee whom they knew to be unarmed and who had been compliant with the officers' demands); *Herrera v. Bernalillo Cty. Bd. of Cty. Comm'rs*, 361 F. App'x 924 (10th Cir. 2010) (holding that tackling a compliant and subdued detainee was a clearly established violation of the Fourth Amendment).

[103] *See Corona v. Aguilar*, 959 F.3d 1278, 1282 (10th Cir. 2020) (holding that an officer had violated the Fourth Amendment when officer in the course of a traffic stop arrested a passenger when the passenger refused to provide ID and there was no reasonable suspicion of an underlying crime, no probable cause, and no warrant); *Mglej v. Gardner*, 974 F.3d 1151 (10th Cir. 2020), cert. denied, No. 20-1082, 2021 WL 1520808 (U.S. Apr. 19, 2021) (holding that the Fourth Amendment was violated when an officer arrested plaintiff without a warrant in an unreasonable misapplication of a Utah statute).

## II.  Withers is not entitled to qualified immunity for his retaliatory violation of Joe's First Amendment rights.

The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech.[104] A plaintiff may establish a claim for retaliation by showing three things: (1) that the plaintiff was engaged in a constitutionally protected activity, (2) that the defendant's action caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) that a defendant's action was substantially motivated as a response to the plaintiff's exercise of his First Amendment speech rights.[105] Additionally, in the case of a retaliatory arrest, a plaintiff must allege an absence of probable cause for the arrest (or, as addressed above, selective enforcement that vitiates alleged suspicion / probable cause).[106]

In this case, Withers retaliated against Joe's speech in two ways, first by pointing his gun at Joe, and second by arresting Joe without probable cause. Plaintiff has pled sufficient facts to show a retaliatory arrest, and Withers is therefore not entitled to qualified immunity on the First Amendment claim.  Applying the above analysis to the facts of this case, (1) Joe's speech was constitutionally protected.[107] (2) Withers' pointing his firearm and wrongfully arresting Joe has

---

[104] *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

[105] *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007).

[106] *Id.*

[107] *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, No. 20-255, 2021 WL 2557069, at *6 (U.S. June 23, 2021) (noting that speech which is vulgar is not outside of First Amendment Protections); *United States v. McKinney*, 9 F. App'x 887, 889 (10th Cir. 2001) (holding that a defendant's telling an officer to "go f*** himself" was a constitutionally protected objection to an officer's inquiries); *Diaz v. Metzgar*, No. CIV-12-1117 KG/KBM, 2014 WL 12789002, at *6 (D.N.M. Aug. 11, 2014) ("the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.") (*quoting City of Houston v. Hill*, 482 U.S. 451, 461 (1987)).

caused Joe injury[108] enough to chill a person of ordinary firmness from speech.[109] (3) Defendant Withers' actions were motived by Joe's speech, as evidenced by his knowledge that Joe was not armed[110], temporal proximity (pointing his weapon immediately after Joe's speech), and his later complaint to a co-worker about Joe's speech.[111] Lack of probable cause for the arrest has been addressed above.[112]

Defendant's Motion to Dismiss does not engage with the proper analysis for retaliation against protected speech.[113]  Defendants argue that the retaliation claim should, as a preliminary matter, be analyzed under the *Graham* factors[114], and that Withers is entitled to qualified immunity on Joe's retaliation claim because Withers did not use unreasonable force under *Graham*.[115] That argument improperly conflates Fourth Amendment and First Amendment rights.  Wholly apart from the Fourth Amendment, under the First Amendment there is *no* acceptable level of force an officer may use when retaliating against protected speech.  Defendants cite no case law supporting a preliminary application of the *Graham* factors under the First Amendment[116], nor would it make

---

[108] Revised Amended Compl. at ¶¶ 140-146.

[109] *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019) (holding a retaliatory arrest to be sufficiently chilling).

[110] Revised Amended Compl. at ¶¶ 40-41, 96.

[111] *Id.* at ¶ 86.

[112] *See infra* § I.D. *See also Diaz v. Metzgar*, No. CIV-12-1117 KG/KBM, 2014 WL 12789002, at *6 (D.N.M. Aug. 11, 2014) ("finding evidence that constitutionally protected action immediately followed by disciplinary action against plaintiff was sufficient to support reasonable inference that defendants had retaliatory motive." (*explanatory parenthetical citing Smith v. Maschner*, 899 F.2d 940, 948-50 (10th Cir. 1990)).

[113] Motion to Dismiss at 21-23, ECF No. 11.

[114] *Id.* at 22-23.

[115] *Id.*

[116] Plaintiff has found only a few cases with claims of retaliatory excessive force, but in none of them did the court apply the *Graham* factors prior to its retaliation analysis. *See Diaz v. Metzgar*, No. CIV-12-1117 KG/KBM, 2014 WL 12789002, at *6 (D.N.M. Aug. 11, 2014) (refusing to apply the *Graham* factors to a retaliatory battery that occurred after an arrest); *Buck v. City of*

sense. First Amendment claims are evaluated by the three-step test described above, and do not require a plaintiff to also prove an underlying Fourth Amendment violation.

Finally, even if *Graham*'s Fourth Amendment analysis somehow governed Joe's First Amendment claim, all of the *Graham* factors weigh against Withers' use of force.

### A. Withers' use of his firearm was excessive force.

Courts apply a three-part analysis, known as the *Graham* factors, in determining whether a use of force was excessive under the Fourth Amendment. Courts consider (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.[117] The reasonableness of an officer's use of force depends not only on whether the officer believed he was in danger at the time, but also on whether the officer's "own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."[118]

Under the *Graham* factors, a jury could infer that Withers' use of force was not justified. With respect to severity of the offense, Joe was stopped for an alleged equipment violation, an infraction not even justifying an arrest let alone force. Defendants cannot rely on unalleged other suspicions in a motion to dismiss (particularly when no charges were ever brought and the government did not even attempt to justify the stop in response to Joe's state-court forfeiture

---

*Albuquerque*, No. CV 04-1000 JP/DJS, 2007 WL 9734037, at *40 (D.N.M. Apr. 11, 2007), aff'd, 291 F. App'x 122 (10th Cir. 2008), and aff'd in part, appeal dismissed in part, 549 F.3d 1269 (10th Cir. 2008) (declining to exercise jurisdiction over the retaliation claim).
[117] *Id.* at 396.
[118] *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1320 (10th Cir. 2009), *citing Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir.1997).

challenge). But even allowing Defendants a claim that Withers suspected Joe of the more serious crime carrying narcotics – an admission of pretext – this still would not justify the use of force.[119]

With respect to the second *Graham* factor, Withers had no reason to (and did not) fear for his safety or that of others. Withers and Joe were not near others on the highway. Withers had already visually searched Joe for weapons. Joe had stated he was unarmed and had been cooperative throughout the stop[120] and, as shown by the body cam, Withers had turned his back on Joe at various times. Lastly, Joe was making no attempt to avoid arrest or flee. When Withers drew his weapon, Withers had not told Joe he was under arrest, therefore, Joe had no reason to flee or call for backup. Defendants' arguments to the contrary are not based on allegations of the Complaint, and are implausible under their own characterization of the facts.[121] Nor are they consistent with the video, which shows Withers drawing and pointing his gun directly in response to Joe's comments about "my [Withers'] mom," as Withers essentially admitted to his colleague.

---

[119] Defendants' motion does not specify whether Withers suspected Joe of mere possession or the less common offense of trafficking. Even if Withers were allowed to rely on a completely unsupported speculation of trafficking, this still would not support of Withers use of force without suspicion of a more dangerous crime or suspect. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1052-53 (10th Cir. 1994) (suspicion of trafficking drugs does not justify per se use of guns and handcuffs without more particularized evidence, tips, or observations that would give rise to a belief that a suspect is armed or violent); *State v. Baker*, 2010 UT 18, ¶ 52, 229 P.3d 650, 666 ("Unless officers can point to a specific reason why suspected possession of narcotics by an individual led them to believe the individual to be armed and dangerous, their suspicion of drug possession cannot support a reasonable belief that the individual posed a threat.").

[120] *See State v. Baker*, 2010 UT 18, ¶ 53, 229 P.3d 650, 666 (holding that an officer did not have an objectively reasonable suspicion that a detained individual posed a threat when the detainee had been cooperative and voluntarily relinquished a knife), and cases cited.

[121] Even if Joe had been calling for backup, a claim for which there is literally no support, this would not have posed an immediate threat necessitating a firearm. Withers does not claim it is uncommon for people to make or receive calls during police stops, or even to record the stop.

Withers' use of force was also unjustified because his own actions escalated the conflict. As shown on the body cam, throughout the stop Joe had been compliant and cooperative while calmly expressing his disagreement and frustration with Withers, who was deliberately delaying and letting his dog scratch Joe's new car. It was only after Withers snatched Joe's phone and physically shoved Joe backward that Joe shouted and cursed.[122] Withers responded to this development – that he created – by pointing his gun at Joe.

Defendants seek to downplay Withers' use of deadly force by characterizing the reckless pointing of a firearm at another person as "relatively minor" and lasting less than ten seconds. But a jury could certainly disagree with this (rather disturbing) minimalization, and the pointing of a firearm is considered the use of deadly force regardless of whether an officer pulls the trigger.[123] Ultimately, whether the pointing of a firearm constitutes excessive force is a fact-intensive inquiry that is inappropriate for determination at the motion to dismiss stage.[124]

### B. Withers did not have probable cause to arrest Joe.

Defendants argue that to the extent Joe's claim of retaliation relates to Withers' seizure or arrest, these claims fail because Withers had probable cause to seize and arrest Joe.[125] As discussed in § I.D., a jury could infer that Joe's arrest was not supported by probable cause.

---

[122] *McGarry v. Bd. of Cty. Commissioners for Cty. of Lincoln*, 294 F. Supp. 3d 1170, 1198 (D.N.M. 2018) (finding that a yelling but unarmed suspect did not pose an immediate threat).
[123] *Grass v. Johnson*, 322 F. App'x 586, 589–90 (10th Cir. 2009) ("Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.").
[124] *Pittman v. King*, No. 20-CV-03371-PAB-NRN, 2021 WL 2514629, at *9 (D. Colo. June 17, 2021) (discussing factors the Tenth Circuit courts consider in deciding whether pointing a gun constitutes excessive force).
[125] *See* Defendant's Motion to Dismiss at 24, ECF No. 11.

## III.   PLAINTIFF HAS PLAUSIBLY PLED A CLAIM FOR RELIEF UNDER UTAH LAW.

A plaintiff may bring a claim to judicially enforce a right under the Utah Constitution so long as the constitutional clause is self-executing.[126] To succeed on a claim for damages of a self-executing right, a plaintiff must show three elements:  (1) a flagrant violation of his constitutional rights, (2) that existing remedies do no redress his injuries, and (3) that equitable relief was and is wholly inadequate to protect the plaintiff's rights or redress his injuries.[127] Where a complaint seeks relief under both § 1983 and the Utah constitution, courts allow both claims to proceed beyond the motion to dismiss stage, because the court has limited information about any overlap between the claims at that stage and cannot determine which claim might be meritorious.[128]

Defendants' Motion to Dismiss argues that Plaintiff's claims fail because Plaintiff cannot show that existing remedies do not redress his injuries.[129] Defendants' basis for this argument is an unpublished federal case that granted summary judgment on state claims that had a federal counterpart.[130] Defendants' arguments fail because this is a motion to dismiss, not for summary judgment. Plaintiff's state claims, including his due process DNA claim, should be permitted to proceed and Plaintiff allowed the opportunity to distinguish his federal and state claims.

---

[126] Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist., 2000 UT 87, ¶ 7, 16 P.3d 533, 535.

[127] *Id.* at ¶¶ 23–25.

[128] *Finlinson v. Millard Cty.*, 455 F. Supp. 3d 1232, 1244 (D. Utah 2020), *citing See Nielson v. City of S. Salt Lake*, Case No. 2:06-cv-335-CW, 2009 WL 3562081 (D. Utah Oct. 22, 2009); *Cavanaugh v. Woods Cross City*, Case No. 1:08-cv-32-TC-BCW, 2009 WL 4981591 (D. Utah Dec. 14, 2009); *Hoggan v. Wasatch Cty.*, Case No. 2:10-cv-01204-DS, 2011 WL 3240510 (D. Utah July 28, 2011).

[129] *See* Motion to Dismiss at 25, ECF No. 11.

[130] *Id. citing Cavanaugh v. Woods Cross City*, No. 1:08-CV-32-TC-BCW, 2009 WL 4981591, at *6 (D. Utah Dec. 14, 2009) (not selected for publication).

Defendants further argue Plaintiff's state claims can be dismissed for the same reasons that the federal claims may be dismissed. For the reasons articulated above, Plaintiff has sufficiently pled his claims. Moreover, Defendants' motion does not establish (or even argue) that Hoskins' state constitutional rights are co-extensive with his federal rights; accordingly, they have not established that dismissal of federal claims would be fatal to state claims. [131]

Defendants state, without argument or analysis, that Plaintiff's state law selective enforcement claim fails. Defendants' conclusory assertion offers no indication as to why or how Plaintiff's pleadings fail. Absent such argument, Plaintiff's selective enforcement claims should be permitted to proceed.

## IV.   PLAINTIFF HAS PLAUSIBLY PLED A DUE PROCESS VIOLATION

The Fourteenth Amendment guarantees the right to "due process of law" before the government may deprive an individual of protected interests. In analyzing a due process claim, a court applies a two-step inquiry. First, a court asks whether a plaintiff has been deprived of an interest in life, liberty, or property. [132] Protected interests may be created by the Due Process clause or state law. [133] Second, the court asks whether the procedures followed by the government in depriving a plaintiff of that interest comported with due process of law. [134] Due process entails a right to notice and a meaningful opportunity to be heard. [135]

---

[131] *State v. DeBooy*, 2000 UT 32, ¶ 12, 996 P.2d 546, 549 (holding that Article 1, § 14 of the Utah Constitution provides a greater expectation of privacy than the Fourth Amendment).
[132] *Elliott v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012).
[133] *See Id.* at 1244 (discussing the application of the due process analysis); *Brown v. Eppler*, 725 F.3d 1221, 1226 (10th Cir. 2013).
[134] *Elliott*, 675 F.3d at 1244.
[135] *LaChance v. Erickson*, 522 U.S. 262, 266, 118 S. Ct. 753, 756, 139 L. Ed. 2d 695 (1998)

This case has to do with property and privacy interests individuals hold in their DNA. The facts pled in the Revised Amended Complaint plausibly allege a violation of this interest.

## A. Plaintiff has Constitutionally protected privacy and property interests in his DNA

The collection of DNA implicates a person's "interest in the privacy of his identifying information, *i.e.*, his DNA sample and the information derived from it."[136] The Tenth Circuit has previously held that individuals have a constitutional right of privacy in personal matters such as medical and certain financial records.[137] DNA samples contain genetic information that is inherently genetic, medical, and personal—and thus protected.[138] DNA is also property; indeed, corporate purchases of DNA databases such as Ancestry.com, 23andMe, ftDNA, and MyHeritage all within the past year illustrate the commercial value of DNA.

Joe and others similarly situated have constitutionally protected privacy and property interests in their DNA. In a rather surprising argument, Defendant Anderson – the person in charge of Utah's DNA collection and disposition – seems to argue that citizens do not have a protected privacy right in their DNA. While this raises broader concerns about Utah's treatment of compelled DNA, it is based on cases that are factually irrelevant.[139] Unlike the cases cited by Defendants, Joe

---

[136] *Johnson v. Quander*, 370 F. Supp. 2d 79, 92 (D.D.C. 2005), aff'd, 440 F.3d 489 (D.C. Cir. 2006)

[137] *Sheets v. Salt Lake Cty.*, 45 F.3d 1383, 1387–88 (10th Cir. 1995).

[138] DNA., Black's Law Dictionary (11th ed. 2019). *See* Utah Code § 53-10-406(1)(f), (12) (limited the permitted uses of DNA samples)*; See also Maryland v. King*, 569 U.S. 435, 442-44 (2013) (discussing the powerful potential uses of DNA and discussing the limits Maryland's DNA collection statute places on the use of DNA).

[139] *See* Motion to Dismiss Amended Compl. at 13, ECF No. 23. Defendants cite a body of case law speaking to due process and DNA collection in contexts in which individuals have a reduced expectation of privacy, such as convicted inmates. *See Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52 (2009) (prisoner did not have a due process postconviction right to additional DNA testing); *Breithaupt v. Abram*, 352 U.S. 432 (1957) (taking of a blood sample from unconscious driver without a warrant or consent was not a due process violation when

and the plaintiff class do not have a diminished expectation of privacy. Plaintiff's privacy interest

in the personal matter of his DNA satisfies the first part of the two-part due process inquiry.

**B. Utah's DNA Statute also creates a protected interest in the process to ensure and verify the timely destruction of DNA specimens and profiles.**

State law can create a protected interest under the Due Process Clause.[140] A state-created

interest is not protected by the procedural component of the Due Process Clause unless the interest

is an entitlement, meaning that the asserted right to property or liberty is mandated by state law

when a specified predicate exists.[141] A court determines when a statute creates a liberty interest by

looking to the language of the statute itself.[142] The court focuses on "the degree of discretion given

the decisionmaker" in applying the law.[143] A statute which mandates an outcome when objective

criteria have been met creates a substantive right.[144]

Utah Code creates a protected interest in an arrestee's DNA. The mandatory nature of this

right is reflected in the compulsory language of the statute which states that the Bureau of Forensic

Services *shall* destroy a DNA specimen obtained under Utah's DNA collection statute if criminal

charges have not been filed within 90 days after booking for an alleged offense.[145] The term "shall"

driver smelled of alcohol and was in possession of partially empty whiskey bottle); *Boling v. Romer*, 101 F.3d 1336 (10th Cir. 1996) (conditioning parole on an inmate's submission of a DNA sample did not violate Fifth Amendment when inmate had been convicted of predicate offense of sexual assault); *Williams v. Dep't of Rehab. & Correction*, 3 F. App'x 415 (6th Cir. 2001) (prison's collection of DNA from prisoners convicted of violent or sexual offenses did not violate due process). But Defendants' cited cases are wholly irrelevant to the present action, in which Plaintiff is not of a class of persons with a reduced expectation of privacy. He was not even charged with, let alone convicted of, any crime.

[140] *See infra.* note 133.

[141] *Elliott v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012).

[142] *Cordova v. City of Albuquerque*, 816 F.3d 645, 657 (10th Cir. 2016).

[143] *Brown v. Eppler*, 725 F.3d 1221, 1226 (10th Cir. 2013).

[144] *Elwell v. Byers*, 699 F.3d 1208, 1214 (10th Cir. 2012).

[145] *See* Utah Code § 53-10-406(1)(i). Destruction of the specimen would necessarily have to

is mandatory, signifying that the Bureau retains no discretion.[146] The absence of criminal charges within a 90-day window is an objective criteria. By expressly denying the state's right to possess DNA outside of limited predicate circumstances, Utah Code has created a protected substantive interest entitling individuals to the protections of procedural due process.

Defendants argue that Utah Code requires a particular procedure but creates no substantive right. Apart from lacking logical force, this argument hinges on a mischaracterization of § 53-10-406 as procedural rather than outcome driven.[147] § 406(1)(i) requires that applicable DNA specimens be destroyed. This is a mandated outcome. Yet under the statute, there is no mechanism by which an uncharged arrestee is given any notice, can confirm whether or when his DNA specimen was destroyed under § 406(1)(i), can learn what was done with it (for example, whether the specimen was tested or submitted to any databases), or to force destruction if it has not occurred. (By contrast, § 406(6) does provide procedures for a charged person who is acquitted or whose conviction is reversed.) In short, the statute provides no notice, no opportunity to be heard, and no means of enforcing an express statutory right. It is a patent due process violation.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss.

---

include destruction of any profiles that have been produced from the specimen, and the withdrawal of any data from the specimen submitted to DNA databases.

[146] *Swallow v. Kennard*, 2008 UT App 134, 183 P.3d 1052, 1057 ("Ordinarily, the use of the word 'shall' in a statute creates a mandatory condition, eliminating any discretion on the part of the courts."); SHALL, Black's Law Dictionary (11th ed. 2019).

[147] *See State ex rel. T.M.*, 2003 UT App 191, ¶ 17, 73 P.3d 959, 964 (explaining that a procedural law prescribes the practice and procedure or the legal machinery by which the substantive law is determined or made effective"(cleaned up)).

DATED this 19th day of July, 2021.

CHRISTENSEN & JENSEN, P.C.

*/s/ Karra J. Porter*
Karra J. Porter
Anna P. Christiansen
*Attorneys for Plaintiff Joseph M. Hoskins*