IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOSEPH M. HOSKINS,<br><br>Plaintiff,<br><br>v.<br><br>JARED WITHERS, and JESS L. ANDERSON,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:20-cv-749<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff Joseph Hoskins sues Utah Highway Patrol Officer Jared Withers and Jess Anderson, Commissioner of the Utah Department of Public Safety, alleging violations of the First and Fourth Amendments as well as the corresponding provisions in the Utah Constitution. He also asserts a Fourteenth Amendment due process claim on behalf of himself and a putative class of similarly situated individuals. Officer Withers claims qualified immunity and both Defendants move to dismiss all claims. The court grants this motion.

## I.

On November 13, 2018, Mr. Hoskins was driving westbound on I-80 in Toole County, Utah. *See* Dkt. No. 17 ¶¶ 8–9.[1] After observing Mr. Hoskins' vehicle, Officer Withers initiated a traffic stop. *See id.* ¶¶ 10–13. Immediately after pulling Mr. Hoskins over, Officer Withers called the plate number into dispatch, stating "I believe it's AZ39390 Illinois." *Id.* ¶ 16. Officer Withers

---

[1] These facts are taken from the Amended Complaint, *see* Dkt. No. 17, as well as Officer Withers' body camera footage, *see* Dkt. No. 12, which is cited in the Amended Complaint, *see* Dkt. No. 17 at ¶ 20.

then exited the vehicle, approached Mr. Hoskins, and informed him that he had been stopped because his license plate frame obscured the name of the issuing state. *See id.* ¶ 19–20. Mr. Hoskins produced his driver's license and exited the vehicle to examine the plate with Officer Withers. *See id.* ¶¶ 20–23. Pictures taken during the stop and later included in the complaint show that "Illinois" is almost completely obscured by the frame with only the very bottom of each letter visible. *See id.* at 8.

Mr. Hoskins explained that he had received the car like this from the dealer. *See id.* ¶ 33. Officer Withers commented that it was "[n]ot a huge deal" and asked for Mr. Hoskins' registration and insurance information. *Id.* Mr. Hoskins provided the registration and began looking for his insurance information on his phone. *See id.* ¶¶ 33, 37–38. While Mr. Hoskins was looking for this information, Officer Withers asked Mr. Hoskins where he was headed and what his plans were; Mr. Hoskins responded that he was headed to Reno to gamble. *See id.* ¶¶ 37–38. With Mr. Hoskins still unable to find the insurance information, Officer Withers asked Mr. Hoskins to sit with him in the patrol car while Mr. Hoskins looked for the insurance information. *See id.* ¶ 38.

On their way to the patrol car, Officer Withers asked Mr. Hoskins if he was armed and if he could lift his shirt and show his waist band. *See id.* ¶ 40. Mr. Hoskins stated that he was not armed and complied with this request. *See id.* ¶ 41; Dkt. No. 12 at 2:34:15–21. Before entering the vehicle, Officer Withers commented to his body camera that Mr. Hoskins "was shaking really bad, breathing heavy." Dkt. No. 12 at 2:34:20. The two then sat in the front seats of the patrol car. *See* Dkt. No. 17 ¶ 42.

Officer Withers began entering Mr. Hoskins' information into his computer to prepare a citation and, while he was doing this, asked Mr. Hoskins more questions relating to his employment status and travel plans. *See id.* ¶¶ 43–45. Officer Withers then called Mr. Hoskins'

information into dispatch and asked that a driver's license and warrant check be completed. *See id.* ¶ 46. While waiting for dispatch to complete the check, Officer Withers then instructed Mr. Hoskins to "hang tight" and proceeded to retrieve his police canine. *Id.* ¶¶ 47, 49.

Officer Withers took the dog to Mr. Hoskins' car and made "three passes of the driver's side, five passes of the front side, two passes of the rear of the vehicle, and two passes of the passenger side." *Id.* ¶¶ 50–52. The dog sniff lasted fewer than 90 seconds. *See* Dkt. No. 12 at 2:36:45–2:38:10. During the sniff, the dog twice tried to enter the vehicle through the passenger window. *See* Dkt. No. 17 ¶¶ 53–54. After the first attempt, Officer Withers commented to his body camera that "he's just following an odor right into the car." Dkt. No. 12 at 2:37:50. When the dog tried to enter a second time, Officer Withers stated: "OK, I'm going to call that an indication, he keeps trying to jump in the window." *Id.* at 2:37:55. At this point, dispatch had not yet responded with the results of the license and warrant check.

Officer Withers then returned the dog to the car and explained to Mr. Hoskins that the dog was trying to go after a drug odor in the car and that he would now search Mr. Hoskins' vehicle. *See* Dkt. No. 17 ¶¶ 56, 61. Officer Withers directed Mr. Hoskins to exit the vehicle, place his cell phone on the hood of the patrol car, and stand near a delineator post approximately 50 yards from Mr. Hoskins' vehicle while Officer Withers conducted the search. *See id.* ¶¶ 63–68; Dkt. No. 12 at 2:39:26–46. Officer Withers walked Mr. Hoskins to the post and then returned to the patrol car to retrieve his gloves. *See* Dkt. No. 17 ¶¶ 69–70, 72. At this point, dispatch responded that Mr. Hoskins had no outstanding warrants and possessed a valid driver's license. *See* Dkt. No. 12 at 2:40:05.

Upon returning to Mr. Hoskins' vehicle, Officer Withers observed Mr. Hoskins using a second cell phone with his back turned, hiding it from view. *See* Dkt. No. 17 ¶ 74; Dkt. No. 12 at 2:40:40–2:41:02. He walked up to Mr. Hoskins, grabbed the phone away from him, and pushed

Mr. Hoskins with his left hand, causing him to take a step back. *See* Dkt. No. 12 at 2:41:00. The two then engaged in a brief verbal altercation with Mr. Hoskins profanely insulting both Officer Withers and his mother. *See* Dkt. No. 17 ¶ 82. Officer Withers later told another officer "Dude, I don't like him much after he said what—about my mom. You know? I mean, that was like— dude, that was below the belt there." *Id.* ¶ 86.

Mr. Hoskins was still talking as Officer Withers began to walk away. After about six steps, Officer Withers stopped and turned. *See id.* ¶¶ 84–85. Mr. Hoskins was standing with his left hand at his side, partially obscured by the angle and his jacket. *See* Dkt. No. 12 at 2:41:25. Officer Withers immediately drew his firearm and pointed it at Mr. Hoskins, shouting "get your hand out of your pocket." *Id.* at 2:41:26. He ordered Mr. Hoskins to turn around and place his hands on the back of his head. *See* Dkt. No. 17 ¶ 92. Mr. Hoskins immediately complied, and Officer Withers returned his firearm to its holster. *See* Dkt. No. 12 at 2:41:30–35. Officer Withers' weapon was drawn for approximately eight seconds. *See id.* at 2:41:26–33. Officer Withers then called for backup, handcuffed Mr. Hoskins, and escorted Mr. Hoskins back to the patrol car where he stayed for the remainder of the stop. *See* Dkt. No. 17 ¶¶ 93–94, 97–100, 112. Officer Withers specifically told Mr. Hoskins, "you aren't under arrest, you are being detained." Dkt. No. 12 at 2:41:52.

Officer Withers and a second officer who had now arrived proceeded to search Mr. Hoskins' car. *See* Dkt. No. 17 ¶¶ 110–11. After an extended search, the officers discovered two packages of cash secured in the lining of the rear seats between the trunk compartment and the seat frame. *See id.* ¶¶ 111, 113–14. The officers had to use tools to dissemble the rear seat to retrieve these packages. *See* Dkt. No. 12 at 3:26:30–3:28:30. Each package was vacuumed sealed and then incased in a second layer of plastic wrapping. *See id.* at 3:28:45–3:29:00. The packages

contained a total of $89,000. *See* Dkt. No. 17 ¶ 126. Another $1,350 was later found on Mr. Hoskins' person. *See id.*

Officer Withers then informed Mr. Hoskins that he was "being detained for the large amount of money that's in the car."[2] *Id.* ¶ 116. Mr. Hoskins was cited for the equipment violation, money laundering, and criminal conspiracy. *See id.* ¶ 124. Mr. Hoskins was booked into the Toole County jail that night, his car was impounded, and the cash was seized. *See id.* ¶¶ 122–23, 127. Pursuant to Utah Code § 53-10-404.5, Mr. Hoskins' DNA was collected at the jail. *See id.* ¶ 125. He was subsequently released, and no criminal charges were ultimately brought. *See id.* ¶¶ 129, 132. Under Utah law, the Bureau of Forensic Services was accordingly required to destroy his DNA specimen because "criminal charges [had] not been filed within 90 days after booking for an alleged offense." *Id.* ¶ 133 (quoting Utah Code § 53-10-406(1)(i) (2018)).

Mr. Hoskins filed this suit on October 28, 2020.

## II.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A plaintiff cannot satisfy this standard by offering "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Id.* (cleaned up). Nor will the court "accept as true a legal conclusion"—even if its "couched as a factual allegation." *Id.* (cleaned up). Rather, a

---

[2] It appears that Officer Withers misspoke and actually meant that Mr. Hoskins was being "arrested" for the money found in the car given that Mr. Hoskins was already detained, and that Officer Withers proceeded to issue the citation and book him after making this statement.

plaintiff must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (cleaned up).

Although "[t]he usual rule is that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss," *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019) (cleaned up), a "district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). This can include videos. *See Montoya v. Vigil*, 898 F.3d 1056, 1060 n.2 (10th Cir. 2018) (considering an interrogation video attached to the complaint in connection with a motion to dismiss). Here, the bodycam video is referred to in the complaint, *see* Dkt No. 17 ¶¶ 52, 109, 111, and central to Mr. Hoskins' claims and the parties do not dispute its authenticity. The court will accordingly consider this video as well as the allegations set forth in the Amended Complaint in resolving this motion.

## III.

The court first addresses Mr. Hoskins' claims that Officer Withers violated his Fourth Amendment rights and retaliated against him for his speech in violation of the First Amendment.

## A.

Officer Withers invokes qualified immunity with respect to Mr. Hoskins' federal claims. Qualified immunity "shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (cleaned up). To overcome qualified immunity, "the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* (quotation omitted). "When, as here, qualified immunity is raised in a motion to

dismiss, the court accepts the well-pleaded facts contained in the complaint as true and construes them in the light most favorable to the plaintiff." *Mahdi v. Salt Lake City Police Dep't*, 550 F. Supp. 3d 1193, 1198 (D. Utah 2021). Mr. Hoskins "must accordingly allege facts that support a reasonable inference that [Officer Withers] violated" Mr. Hoskins' constitutional rights, "and he must also establish that" these rights were "clearly established when the alleged unconstitutional conduct occurred." *Id.*

The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (cleaned up). A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, (1987). There need not be "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. "[T]he legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). The plaintiff faces a "heavy burden" to overcome qualified immunity. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

**B.**

Mr. Hoskins alleges that Officer Withers violated the Fourth Amendment at each step of the encounter. The court evaluates encounters such as the one at issue here "in a step-by-step manner because what may begin as a routine traffic stop will often escalate into probable cause for a search or a search pursuant to a consensual encounter." *United States v. Lee*, 73 F.3d 1034, 1038 (10th Cir. 1996), *overruled on other grounds by United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001). The court must "examine each stage of the encounter to ensure that the government

had the required amount of reasonable suspicion, probable cause, or consent to support" the challenged police conduct. *Id.*

## 1.

The court begins with Officer Withers' initial stop of Mr. Hoskins. "A traffic stop is a seizure within the meaning of the Fourth Amendment." *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Id.* at 787. The "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

After pulling Mr. Hoskins over, Officer Withers explained that Mr. Hoskins had been stopped because the frame of his license plate holder obscured the name of the issuing State. And Officer Withers ultimately issued Mr. Hoskins a citation for violating Utah Code § 41-1a-404(3)(b)(ii). *See* Dkt. No. 17 at 14. That statute requires that a vehicle's "license plate shall at all times be . . . maintained . . . in a condition to be clearly legible." Utah Code § 41-1a-404(3)(b)(ii). A license plate is required to have "(a) the registration number assigned to the vehicle for which it was issued; (b) the name of the state; and (c) . . . a registration decal showing the date of expiration." Utah Code § 41-1a-402(1).

Mr. Hoskins contends the traffic stop was invalid for several reasons. He first argues that the statute for which he was stopped and given a citation does not apply to out-of-state vehicles. But this argument runs headlong into Tenth Circuit precedent. In *United States v. Eckhart*, the defendants argued that "Utah police officers may not enforce Utah license plate statutes on cars licensed in California." 569 F.3d 1263, 1270 (10th Cir. 2009). The court rejected this argument,

holding that the traffic stop challenged there was valid because the officer "observed a violation of Utah law before he made the stop." *Id.* at 1271 (citing Utah Code § 41-1a-404(3)(b)(ii)). The court further held that applying this law to an out-of-state driver did not violate the Interstate Commerce Clause because "Utah does not treat intra-and interstate travelers differently [and] Utah's requirement that license plates be clearly visible and legible does not place a barrier on interstate movement as it is not unique to Utah and does not contradict the laws of other states." *Id.* at 1272. Mr. Hoskins does not acknowledge *Eckhart* or offer any explanation why it does not control.[3]

Next, Mr. Hoskins argues that even if Section 404 does apply to out-of-state vehicles, it only requires that the numbers and letters of the vehicle's license plate number be legible—not the name of the issuing State. This argument cannot be reconciled with the text of the relevant statutes. Section 402 clearly requires that license plates display three things: the license plate number, the name of the State, and a registration decal. Section 404 then requires the license plate to be "clearly legible." Read plainly, this statute mandates that all three required components of the license plate be "clearly legible."

---

[3] To be sure, the defendants in *Eckhart* did not explicitly argue, as Mr. Hoskins does here, that the language of Section 404 applies by its terms only to Utah license plates. But the court rejects this argument. First, while Section 41-1a-202 expressly exempts out-of-state vehicles from *registration* requirements, *see* Utah Code § 41-1a-202(2)(a) (2018), this statute says nothing about *license plate* requirements. And Section 404 simply states that "License plates issued for a vehicle other than a motorcycle, trailer, or semitrailer shall be attached to the vehicle, one in the front and the other in the rear." Utah Code § 41-1a-404(1). It does not limit application to plates issued "by the State of Utah." This is consistent with the laws of other states. While discussing an analogous Oklahoma law, the Tenth Circuit observed that "every state has some statute prohibiting the obstruction of license plates," but "none has interpreted its statutory scheme to allow out-of-state cars to be driven with obscured license plates." *United States v. DeGasso*, 369 F.3d 1139, 1148 (10th Cir. 2004).

To be sure, Section *403* states that "[l]icense plates and the required letters and numerals on them, except the decals and the slogan, shall be of sufficient size to be plainly readable from a distance of 100 feet during daylight." But Section 404 contains no similar limitation. Given that Section 403 demonstrates that the Utah Legislature knew how to limit laws so that they apply to only some of the required elements of a license plate, the fact that the legislature chose not to do so in Section 404 strongly implies that all three things that must be displayed on a license plate must be "clearly legible."

Finally, Hoskins argues that because Section 404(5) exempts license plates from the legibility requirement when the car has a trailer hitch; wheelchair lift; trailer; a bicycle, ski, or luggage rack; or a similar cargo carrying device, it should be read to also exempt license plates with frames.[4] This argument, too, is foreclosed by the statutory text. For although Section 404(5) creates other exemptions, it says nothing about license plate frames. And it is of course an established canon of statutory interpretation that "[t]he expression of one thing implies the exclusion of others." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012). Officer Withers' initial stop was thus justified

---

[4] Mr. Hoskins also argues that that the stop was unlawful because Officer Withers "was selectively pursuing enforcement of a law that is not enforced against other drivers with similar license plate frames." Dkt. No. 17 ¶ 32. This argument lacks merit. To be sure, "[s]electivity in the enforcement of criminal laws is subject to constitutional constraints." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (cleaned up). "In particular, the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (cleaned up). But "[b]road discretion has been vested in executive branch officials to determine when to prosecute, and by analogy, when to conduct a traffic stop or initiate an arrest." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003) (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)). Because Mr. Hoskins does not allege that he was impermissibly targeted based on an immutable characteristic or other suspect classification, his argument fails.

because it was based on an "observed traffic violation." *Botero-Ospina*, 71 F.3d at 787. It did not violate the Constitution.

## 2.

The court next addresses the dog sniff. Mr. Hoskins argues that this violated his Fourth Amendment rights because it prolonged the duration of the stop and Officer Withers lacked independent reasonable suspicion to detain Mr. Hoskins solely for purposes of conducting the sniff. Specifically, Mr. Hoskins argues that "[Officer] Withers did not diligently call in [Mr. Hoskins'] information or complete the citation." Dkt. No. 29 at 26.

As a general matter, a "canine sniff" does not constitute a search within the meaning of the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 707 (1983). But "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquires'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (quoting *Caballes*, 543 U.S. at 408). A stop that is prolonged solely for the purpose of conducting a dog sniff may thus violate the Fourth Amendment. *See Caballes*, 543 U.S. at 407.

The body camera footage demonstrates that Officer Withers did not unreasonably prolong the traffic stop to conduct a dog sniff. After showing Mr. Hoskins the reason for the stop, Officer Withers asked him for his registration and insurance. He proceeded to ask Mr. Hoskins several questions while he was waiting for Mr. Hoskins to find his insurance

information. *See* Dkt. No. 12 at 2:33:00–2:34:00.[5] When Mr. Hoskins still continued to look for this information, Officer Withers asked Mr. Hoskins to join him in the patrol car and then asked Mr. Hoskins several more questions; he also began simultaneously entering Mr. Hoskins' information into his computer to prepare a citation. *See id.* at 2:34:00–2:36:22. After he finished entering Mr. Hoskins' information, Officer Withers asked dispatch to "run" Mr. Hoskins' driver's license. *See id.* at 2:36:22. Mr. Hoskins still had not provided his insurance information at this time. *See id.* Officer Withers then initiated the dog sniff. *See id.* at 2:36:48.

Officer Withers completed the dog sniff before dispatch completed the driver's license and warrant check and reported the results to Officer Withers. *See id.* at 2:38:10. Indeed, dispatch did not do so until two minutes *after* Officer Withers completed the sniff. *See id.* at 2:40:05. The dog sniff thus did not prolong the stop because Officer Withers was still completing his "mission," which included checking for proof of insurance and "determining whether there are outstanding warrants against the driver" at the time the sniff took place. *Rodriguez*, 575 U.S. at 355.

Nor can Officer Withers be faulted for calling in the warrant check instead of performing it on his computer or for entering Mr. Hoskins' information first and then calling it in. In *United States v. Mayville*, the Tenth Circuit explained that an officer's decision to run "the records check through dispatch" instead of relying "exclusively on the information available on the computer in his patrol car" does not violate the Fourth Amendment because "the Fourth Amendment does not require officers to use the least intrusive or most efficient means

---

[5] To be sure, Mr. Hoskins stated that he had an email with a policy number and asked if that was sufficient. *See* Dkt. No. 12 at 2:35:28–2:35:32. Officer Withers responded that he needed something showing the date of coverage. *See id.* Mr. Hoskins never actually provided the policy number or any information with the date of coverage.

conceivable to effectuate a traffic stop." 955 F.3d 825, 832 (10th Cir. 2020) (citing *United States v. Sharpe*, 470 U.S. 675, 687 (1985). The dog sniff did not violate the Fourth Amendment.[6]

### 3.

The court next turns to the search of Mr. Hoskins' vehicle. Mr. Hoskins contends that, under the facts alleged in the complaint, Officer Withers' dog never alerted, and he thus lacked probable cause to search Mr. Hoskins' vehicle. *See* Dkt. No. 29 at 28. Were the court's analysis limited to Mr. Hoskins' allegations, this argument might be well taken. The body camera footage, however, contradicts Mr. Hoskins' allegations and demonstrates that Officer Withers had probable cause to search the vehicle.

The general rule is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389

---

[6] This conclusion is consistent with the Tenth Circuit's recent holding in *United States v. Frazier*, 30 F.4th 1165 (10th Cir. 2022). There, the court held that the arresting officer twice violated the Defendant's Fourth Amendment rights by extending the duration of the traffic stop without reasonable suspicion. Specifically, the officer deviated "from the traffic-based mission of the stop" by spending several minutes trying to arrange a dog sniff and by later running the Defendant's license plate through a DEA database to track his past movement. *Id.* at 1171, 1173, 1180. Here, by contrast, Officer Withers did not prolong the stop by deviating from his mission. Though Mr. Hoskins takes issue with the extent of questioning by Officer Withers, those questions were asked while Officer Withers was entering Mr. Hoskins' information to prepare a citation and waiting for Mr. Hoskins to provide his insurance information. To the extent there was any delay, it appears to have been caused by Mr. Hoskins' inability promptly to produce his insurance information. Nor was Officer Hoskins required to accept informal insurance information that did not clearly meet the requirements for establishing proof of insurance under Utah law or even provide the dates of coverage. *See* Utah Code §§ 41-12a-303.2(2), 41-12a-402. And the dog sniff itself occurred only while Officer Withers was waiting for dispatch to provide the results of the license and warrant check—a check that Officer Wither requested promptly after entering Mr. Hoskins' information into his computer. *Shaw v. Schulte*, 36 F.4th 1006 (10th Cir. 2022), is also inapposite. Unlike here, the officers in *Shaw* had completed all tasks related to the original traffic stop and further prolonged the stop to conduct a dog sniff without reasonable suspicion of additional criminal activity. *See id.* at 1010–12, 1016, 1020.

U.S. 347, 357 (1967) (footnote omitted). One such exception relates to cars. A warrantless search of an automobile is reasonable if there is probable cause to believe it contains contraband. *See United States v. Ross*, 456 U.S. 798, 809 (1982). "[A] positive dog alert gives officers probable cause to search." *United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009). The Tenth Circuit has specifically declined to adopt "the stricter rule" that the dog must "give a final indication before probable cause is established." *Id.* at 1282.

During the sniff, Officer Withers' dog twice tried to enter the vehicle through the passenger window. After the first attempt, Officer Withers commented to his body camera that "he's just following an odor right into the car." Dkt. No. 12 at 2:37:50. Officer Withers then took the dog away from the door towards the front of the car before allowing it to return to the passenger door. The dog again attempted to jump through the open window into Mr. Hoskins' car and Officer Withers stated to his body camera: "OK, I'm going to call that an indication, he keeps trying to jump in the window." Dkt. No. 12 at 2:37:55.

In *United States v. Forbes*, the Tenth Circuit recognized the difference between a dog "alert" and a dog "indication." 528 F.3d 1273, 1275 n.3 (10th Cir. 2008). "[A] properly trained canine will 'alert' to the *presence* of contraband when it *first* encounters a known odor by changing its body posture and by increasing its respiration. By contrast, the same dog will 'indicate' *the precise location* of that contraband through some other change in behavior, such as by staring, sitting, scratching, biting, or barking." *Id.*

Although Mr. Hoskins seeks to dismiss reliance on the dog's reaction as a "post-hoc attempt[] to justify the search," Dkt. No. 29 at 28, Officer Withers' contemporaneous comments to his body camera make clear that he immediately recognized the change in his dog's behavior. Indeed, he twice noted the dog's effort to enter the vehicle through the open window. The court

14

concludes that this behavior is sufficient for a reasonable officer to believe that the dog had indicated and that he therefore had probable cause to search the vehicle.[7]

Even if Officer Withers incorrectly determined that his dog alerted or indicated, the court concludes that his mistake was reasonable and did not violate the Fourth Amendment. The Court has long recognized that "the Fourth Amendment allows for some mistakes on the part of government officials," and that "searches and seizures based on mistakes of fact can be reasonable." *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014). The mistakes, however, "must be those of reasonable men." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). Here, Officer Withers observed a dramatic change in his dog's behavior as the dog repeatedly attempted to enter Mr. Hoskins' vehicle. The court concludes that it was reasonable for Officer Withers, the dog's handler, to interpret these changes in behavior to be the result of the dog's detecting contraband. For all of these reasons, the court concludes that the search did not violate the Fourth Amendment.

## 4.

The court next addresses Mr. Hoskins' arrest. An arrest is reasonable when "there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). It requires "only a probability or substantial chance of criminal activity,

---

[7] While the Tenth Circuit has held that facilitating a dog's entry into a vehicle without probable cause invalidates a subsequent alert by the dog, *see Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 880–81, 884–85 (10th Cir. 2014), it has found no constitutional violation when "(1) the dog's leap into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry, such as a hatchback or window, used by the dog," *United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009). Here, Officer Withers' dog did not actually enter the vehicle and alert once inside. Rather, Officer Withers recognized his dog's indication as the repeated *attempts* to enter the vehicle through the window, meaning the alert occurred outside the vehicle. And a "drug dog sniff outside a car during a lawful traffic stop is not a search." *Felders*, 755 F.3d at 880.

not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Whether probable cause exists "turn[s] on the assessment of probabilities in particular factual contexts," *id.* at 232, and is "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

Mr. Hoskins argues that a "large amount of hidden legal tender in itself is not probable cause for an arrest" and "may only be considered evidence of an illicit connection to drug trafficking (and therefore probable cause for an arrest) when the currency is combined with other persuasive evidence, such as drugs, drug paraphernalia, or notebooks containing notations of large drug transactions." Dkt. No. 29 at 29 (citing *United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two & 43/100 Dollars ($149,442.43) in U.S. Currency*, 965 F.2d 868, 877 (10th Cir. 1992)). Here, probable cause was not based solely on the discovery of the currency, however. Rather, it was based on the combination of the large amount of hidden cash *and other persuasive evidence*.

At the time of the arrest, Officer Withers had discovered two packages containing a total of nearly $90,000 in cash, vacuum sealed and incased in two layers of plastic wrapping, hidden within the rear seat of Mr. Hoskins' vehicle in a way that required the officers to use tools to extract them. Officer Withers' trained dog had also alerted to drug odor within the vehicle and Officer Withers had noticed that Mr. Hoskins "was shaking really bad, breathing heavy." Dkt. No. 12 at 2:34:20. Finally, Officer Withers observed Mr. Hoskins using a second, undisclosed cellphone with his back turned, obscuring the phone from view. The court concludes that these facts, *in combination*, are sufficient to give rise to a "substantial chance of criminal activity." *Gates*, 462 U.S. at 243 n.13. Officer Withers had probable cause to make the arrest.

Mr. Hoskins also contends that Officer Withers arrested him before the discovery of the cash, and thus lacked probable cause at the time of the arrest. *See* Dkt. No. 29 at 29–30. This argument is contradicted by the body camera footage. Although Mr. Hoskins was handcuffed and placed in Officer Withers' patrol car during the search, Officer Withers specifically told Mr. Hoskins that "you aren't under arrest, you are being detained." Dkt. No. 12 at 2:41:52.

To be sure, an officer must have a "reasonable and articulable suspicion of potential danger" to justify "temporary, protective detention." *United States v. Maddox*, 388 F.3d 1356, 1365, 1367 (10th Cir. 2004). But so long as that standard is met, "[a] law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself." *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993) (quotation omitted).

That standard was met here. Prior to detaining Mr. Hoskins, Officer Withers observed him using an undisclosed second cellphone with his back turned towards Officer Withers, hiding its use from view. After Officer Withers took the phone, Mr. Hoskins became verbally combative. Finally, while he was walking away, Officer Withers observed Mr. Hoskins with his left hand at his side, obscured by his jacket. The court concludes that these circumstances are sufficient to establish a "reasonable and articulable suspicion of potential danger." *Maddox*, 388 F.3d at 1367.

For all of these reasons, Mr. Hoskins' arrest did not violate the Fourth Amendment.[8]

---

[8] The fact that Mr. Hoskins' physical location and circumstances did not change between his detention during the search and his arrest afterwards is irrelevant. Given the "reasonable and articulable suspicion of potential danger" that a reasonable officer on the scene would have perceived, Mr. Hoskin's detention during the search was permissible. And given that a reasonable officer would have had probable cause to arrest Mr. Hoskins at the conclusion of the search, Mr. Hoskins' arrest and continued confinement in the patrol car after the search was permissible.

**5.**

Finally, the court addresses Mr. Hoskins' claim of excessive force. The Supreme Court has repeatedly held that when such a claim arises from a police encounter, it is governed by the Fourth Amendment's prohibition of "unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). The Court has also long recognized "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citation omitted), and the "reasonableness" of a particular use of force is assessed under the balancing test established in *Graham*. Under this test, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (cleaned up). This assessment must consider the totality of the circumstances, including: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The overarching inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The Supreme Court has "also emphasized that 'the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Hinkley v. Salt Lake City Corp.*, 426 F. Supp. 3d 1207, 1215 (D. Utah) (quoting *Graham*, 490 U.S. at 396) (cleaned up).

Mr. Hoskins' argument that Officer Withers' use of force was unreasonable faces an immediate uphill battle, for the Tenth Circuit has held that merely pointing a "weapon at an adult who was suspected of a serious crime," without more, does not constitute excessive force under

the Fourth Amendment. *Henry v. Storey*, 658 F.3d 1235, 1239–41 (10th Cir. 2011). At the time Officer Withers briefly pointed his firearm at Mr. Hoskins, he had probable cause to search Mr. Hoskins' vehicle for drugs; the suspected "crime at issue" was thus serious. *Graham*, 490 U.S. at 396.

Officer Withers also had reason to believe that Mr. Hoskins posed an immediate threat to his safety. Moments before drawing his gun, Officer Withers had observed Mr. Hoskins communicating on a second, undisclosed phone in a manner that appeared intended to hide its use from Officer Withers' view. After Officer Withers took the phone, Mr. Hoskins became verbally hostile. *See* Dkt. No. 17 at ¶ 82. And then while walking away, Officer Withers observed Mr. Hoskins with his left hand at his side, obscured by his jacket. Although Mr. Hoskins emphasizes that Officer Withers had already performed a visual waistband inspection, Officer Withers had not patted Mr. Hoskins down or otherwise verified that he was unarmed.

These considerations must be balanced against the extent of force used by Officer Withers. Officer Withers drew his gun and pointed it at Mr. Hoskins for approximately eight seconds before holstering it and handcuffing Mr. Hoskins. The court concludes that Officer Withers' brief and relatively minor use of force was reasonable under the Fourth Amendment in light of the serious crime a reasonable officer would have suspected Mr. Hoskins of committing, Mr. Hoskins' evasive behavior, the escalating nature of the encounter, and the danger to his safety that a reasonable officer would have perceived. *See Graham*, 490 U.S. at 396.

## C.

Mr. Hoskins contends that Officer Withers also violated Mr. Hoskin's First Amendment rights by pointing a gun at him "in retaliation for [Mr. Hoskins'] expression of thoughts and opinions." Dkt. No. 17 ¶ 160. The court concludes that this claim fails as a matter of law.

"'[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quoting *Hartman*, 547 U.S. at 256). Applying this rule, the Court held that probable cause to execute an arrest forecloses a claim of a retaliatory arrest because the non-retaliatory grounds are sufficient to "provoke the adverse consequences."[9] *Id.* at 1722, 1724.

Although *Nieves* involved an arrest rather than the use of force, the court concludes that the same rule applies here. Because the court concludes that Officer Withers' briefly pointing a gun at Mr. Hoskins was reasonable under the Fourth Amendment, it follows that Officer Withers had sufficient "non-retaliatory grounds . . . to provoke" the challenged action and that Mr. Hoskins thus cannot prevail on his First Amendment claim.

## IV.

Finally, the court considers Mr. Hoskins' claim against Mr. Anderson. Mr. Hoskins alleges, on behalf of himself and a putative class, that Mr. Anderson "violated their rights under the Fourteenth Amendment to the U.S. Constitution . . . by depriving them of a protected property interest in their DNA (including any profiles or other data derived therefrom) without due process of law." Dkt. No. 17 ¶ 165. He further contends that the Fourteenth Amendment's Due Process Clause secures a right to "the confirmed destruction of their DNA once Defendants

---

[9] This bright line rule also defeats any First Amendment retaliation claim that Mr. Hoskins might assert based on *his arrest* given that Officer Withers had probable cause to make that arrest, as discussed above.

no longer had any valid interest in possessing it under Utah's DNA collection statutes (Utah Code § 53-10-401, *et seq.* [(2018)])." *Id.* ¶ 166.

The Due Process Clause states that "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "An alleged violation of the procedural due process required by this clause prompts a two-step inquiry: (1) whether the plaintiff has shown the deprivation of an interest in 'life, liberty, or property' and (2) whether the procedures followed by the government in depriving the plaintiff of that interest comported with 'due process of law.'" *Elliott v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012) (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977)). "A protected interest in liberty or property may have its source in either federal or state law." *Id.*

Mr. Hoskins first asserts that he has a protected interest in his DNA generally under the Constitution. This argument is unavailing. Mr. Hoskins alleges a *procedural* not *substantive* due process violation—meaning that any protected interest can be deprived pursuant to adequate procedure.[10] Here, Mr. Hoskins' DNA was taken pursuant to a Utah law of general applicability. *See* Utah Code § 53-10-404.5(1)(a) ("When a sheriff books a person for any offense under Subsections 53-10-403(1)(c) and (d), the sheriff shall obtain a DNA specimen from the person upon booking of the person at the county jail."). When, as here, "'the legislature passes a law

---

[10] The court would have no difficulty dismissing any substantive due process claim based on the collection of Mr. Hoskins' DNA. The Supreme Court has squarely held that collecting a DNA sample without a warrant does not violate the Fourth Amendment in "the context of a valid arrest supported by probable cause." *Maryland v. King*, 569 U.S. 435, 465 (2013). It has also held that when "the Fourth Amendment provides an explicit textual source of constitutional protection" against the challenged governmental action, the claim must be analyzed under "that Amendment" and "not the more generalized notion of 'substantive due process.'" *Graham*, 490 U.S. at 395. Even if Mr. Hoskins could assert a substantive due process claim here, moreover, the court believes that the reasoning underlying the Supreme Court's holding in *King* would also foreclose any substantive due process challenge.

which affects a general class of persons, those persons have all received procedural due process—the legislative process.'" *Oklahoma Educ. Assoc. v. Alcoholic Beverage Laws Enf't Comm'n*, 889 F.2d 929, 936 (10th Cir. 1989) (quoting R. ROTUNDA, J. NOVAK, & J. YOUNG, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE, § 17.8 at 251 (1986)). Thus, even assuming Mr. Hoskins has a protected interest in his DNA that was taken from him, he has received all of the process that was due.

Mr. Hoskins next argues that he has a state created interest in the destruction of his DNA. This argument is equally unpersuasive. Utah Code § 53-10-406(1)(i) requires the Bureau of Forensic Services to "destroy a DNA specimen obtained under this part if criminal charges have not been filed within 90 days after booking for an alleged offense under Subsection 53-10-403(2)(c)." While this may be sufficient to create a protected interest in the destruction of his DNA, Mr. Hoskins does not allege that the Bureau failed to destroy his sample. Rather, he argues that "there is no administrative mechanism by which [Mr. Hoskins] may petition the Bureau as an agency of the Department of Public Safety to ensure that his DNA specimen has been destroyed." Dkt. No. 17 ¶ 139. In essence, Mr. Hoskins argues that his procedural due process rights have been violated, not by Bureau's failure to destroy his DNA, but by the Bureau's failure to create procedures that would allow Mr. Hoskins to confirm the destruction of his DNA.

The court concludes that this claim is not cognizable under the Due Process Clause of the Fourteenth Amendment. As the Tenth Circuit has explained, "protected interests are substantive rights, not rights to procedure." *Elliott*, 675 F.3d at 1245. It follows that "an entitlement to nothing but procedure cannot be the basis for a liberty or property interest." *Stein v. Disciplinary Bd. of Sup. Ct. of N.M.*, 520 F.3d 1183, 1192 (10th Cir. 2008) (cleaned up).

**V.**

"When all federal claims have been dismissed, the court may, and usually should, decline to exercise supplemental jurisdiction over any remaining state claims." *Reyes v. N.A.R. Inc.*, 546 F. Supp 3d 1031, 1042 (D. Utah 2021) (cleaned up); *see also* 28 U.S.C § 1367(c)(3). Because the court has determined that all of Mr. Hoskins' federal claims must be dismissed, it will dismiss Mr. Hoskins' state law claims without prejudice.

\*       \*       \*

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED IN PART**. Plaintiff's federal claims are **DISMISSED WITH PREJUDICE**. Plaintiff's state-law claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

DATED this 18th day of August, 2022

Howard C. Nielson, Jr.
United States District Judge